**UNITED STATES of America,
Appellee,**

v.

**William KIYUYUNG, Defendant–
Appellant.**

No. 98–1273.

United States Court of Appeals,
Second Circuit.

Argued Dec. 11, 1998.

Decided Feb. 9, 1999.

As Amended March 10, 1999.

Eric Seidel, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Alexandra A.E. Shapiro, Assistant United States Attorney, New York, New York, on the brief), for Appellee.

Barry D. Leiwant, New York, New York (The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, New York, on the brief), for Defendant—Appellant.

Before: KEARSE, STRAUB, and SACK, Circuit Judges.

KEARSE, Circuit Judge:

Defendant William Kiyuyung appeals from a judgment entered in the United States District Court for the Southern District of New York following a bench trial before John F. Keenan, *Judge*, convicting him of possession of firearms as a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1) (1994), and sentencing him principally to 42 months' imprisonment, to be followed by a three-year term of supervised release. On appeal, Kiyuyung contends that the district court should have granted his motion to suppress the firearms on which his conviction is based. For the reasons that follow, we vacate and remand for further proceedings.

## I. BACKGROUND

The present prosecution for possession of firearms arises out of the discovery by police officers of three guns belonging to Kiyuyung in the apartment of Kiyuyung and his girlfriend Curlene Branch, following the arrest of Branch on unrelated charges. One of the guns was an antique; Kiyuyung was prosecuted for possession of the other two. The case was tried on stipulated facts following the district

court's denial of Kiyuyung's motion to suppress the guns. The evidence presented by the government at the suppression hearing, describing the discovery of the guns on shelves in a hall linen closet, was principally as follows.

A. *The Evidence at the Suppression Hearing*

On the night of May 12, 1997, New York City police officers Paul Abousamra and Eladio Quiles, members of a car-theft task force, spotted a car, driven by Branch, that a rental company had reported as stolen. The officers followed until Branch parked the car, whereupon, after brief questioning, they placed her under arrest.

Branch had parked the car in front of the building in which she and Kiyuyung lived; after her arrest, she pleaded with Abousamra and Quiles to allow her to use the bathroom in the apartment. The officers assented and accompanied Branch into the building. They did not handcuff Branch because she was quite heavy-set and walked with a cane. When they reached the apartment, Branch, as instructed by the officers, waited just inside the entrance while the officers conducted a quick inspection of the apartment to ensure that there was nothing there to harm them. The kitchen light was on; Abousamra walked through the apartment, shining his flashlight into other areas; and eventually the other lights were turned on.

The bathroom was at the end of a hallway that Abousamra estimated to be approximately four feet wide. Adjacent and perpendicular to the bathroom doorway was a hall closet. Abousamra's security inspection included not only the bathroom but also the hallway leading to the bathroom. Abousamra testified: "I just wanted to make sure there was no weapons [sic] of any sort or anything that while she walked through the apartment to get to the bathroom or even in the bathroom that she could pick up and cause harm to me or my partner." (Suppression Hearing Transcript, February 5, 1998 ("Feb. 5 Tr."), at 17.) In his initial inspection of the bathroom and the hallway, Abousamra did not see any guns. After he completed that inspection, he informed Branch that she could go into the bathroom.

While Branch was in the bathroom, Quiles posted himself outside the bathroom door and, according to the suppression hearing testimony of Abousamra, the following occurred.

Q. What happened at that point?

A. My partner was standing by the bathroom door and he called my attention because he discovered that there was a firearm on the shelf next to the bathroom.

Q. When you say that, how did he discover that, if you know?

A. He just said, Paul, come over here and look what I found here, there is a gun right on the edge of the shelf right here.

Q. And what happened after that?

A. He pointed out to me the shelf where he got it from. And I said, there is another gun right on the next shelf. And after we found that one, we were both looking at the shelves and there was another one right in plain view on the third shelf.

THE COURT: So there were three guns?

THE WITNESS: There were three guns.

Q. You say "plain view." When you found the gun, how did you find the gun?

A. It was pretty much right in front of my eyes. It was laying on the edge of the shelf.

Q. Now, describe the shelf that you found the gun on.

A. It was like an open closet with shelves, and there—I believe there was some toiletries and towels and things like that, other items, some photographs I believe.

Q. Was there a door to this cabinet [*sic*]?

A. I don't remember if there was a door or not.

Q. But was it open to your view?

A. It was open to my view.

Q. Where was it in relation to the bathroom that Ms. Branch was using?

A. It was right next to the bathroom door.

THE COURT: As you looked at the bathroom door, on the right or the left of the bathroom door?

THE WITNESS: If you were standing looking in the bathroom door, it would be on your right-hand side.

(Feb. 5 Tr. 18–19.)

On cross-examination, Abousamra testified that his grand jury testimony had been that he had seen the guns during his initial security check of the apartment:

Q. . . . .

"A. . . . . We entered her apartment, and before I let her use the bathroom, I did a quick visual search to make sure everything was okay for my safety.

"Q. Did you see anything?

"A. Yes. Right at the opening to the bathroom door there was a shelving unit and there were three guns on the shelving unit."

Did you give that testimony?

A. Yes, I did.

(Feb. 5 Tr. 33–34 (quoting Abousamra's grand jury testimony).) At the suppression hearing, however, Abousamra testified that in fact it was Quiles who had spied the guns first:

THE COURT: When you did this initial, first visual search, you didn't see the pistols?

THE WITNESS: No, I didn't.

Q. In fact, you didn't see the pistols until after Ms. Branch was already in the bathroom, is that correct?

A. Right. My partner first saw the first pistol.

. . . .

Q. Is it your testimony today that you did not see those guns until after your partner had pointed them out and called you over to that?

A. Yes, it is.

Q. When your partner pointed those guns out to you, Ms. Branch was in the bathroom, is that correct?

A. I believe she was in the bathroom.

Q. And the closet had a door, didn't it?

A. That I don't remember. I don't remember if the closet had a door or not.

Q. In any event, your partner pointed out at least one gun to you and shortly thereafter you and your partner noticed a total of three guns, is that correct?

A. That's correct.

. . . .

Q. When your partner pointed out the guns to you, they were in the closet on the shelf, is that correct?

A. Yes.

Q. And they wouldn't have been visible from the entranceway of the apartment, is that correct, because they were in the interior of the closet?

A. They were on the outermost portion of the shelf in the closet.

. . . .

Q. And the closet was perpendicular to the right [of the bathroom], is that correct?

A. Yes, it is.

Q. And the closet had walls?

A. Yes.

Q. Those walls weren't transparent or anything?

A. No.

Q. So, the only way you could see into the closet was if you were standing directly in front of the closet?

A. Right.

THE COURT: Which would be in front of the bathroom?

THE WITNESS: In front of the bathroom door.

(Feb. 5 Tr. 32–36.)

When Branch emerged from the bathroom, the officers confronted her with the guns, and she said they belonged to Kiyuyung. The officers took Branch and the guns to the police station. After obtaining Branch's signature on a consent-to-search form, the officers returned to the apartment for a more thorough search. While they were there, Kiyuyung arrived; upon learning of Branch's arrest and the seizure of the guns, Kiyuyung stated that the guns belonged to him.

The government's evidence as to these events was presented solely through the testimony of Abousamra. Quiles did not testify.

Branch and Kiyuyung testified that the guns were not in fact kept in the hall closet by the bathroom but were instead kept in a box behind a safe in a closet in their bedroom. Branch testified that she was in the bathroom for approximately 10 minutes, and the officers had found the guns by the time she came out.

Further, although Abousamra had testified that he did not recall whether the hall closet had doors, a photograph introduced at the suppression hearing revealed that the closet was not doorless. Branch and Kiyuyung testified, consistent with the photograph and without contradiction, that the hall closet had double doors; that those doors opened out into the hall; and that when the door nearer the bathroom was open, it would partially obstruct the bathroom entrance, leaving a space of only some 2–2½ feet. Branch testified that because of her girth and her need to use a cane, the closet door nearer the bathroom had to be closed in order for her to have enough room to enter the bathroom. She testified that when she approached the bathroom on the night in question, the doors to the hall closet were in fact closed.

B. *The District Court's Ruling and the Trial*

In a decision from the bench, the district court denied the suppression motion, finding that the seizure of the guns was lawful because they had been in plain view:

The officer testified that his partner stood outside the bathroom while Ms. Branch used the facilities and that the partner called to Abousamra telling him he had just found a pistol on a shelf outside the bathroom. Abousamra went to his partner and observed two more pistols on other shelves in plain view in an open closet by the bathroom. . . . The court finds this version credible.

Obviously the police wanted to guard the bathroom, the place where Ms. Branch was alone, and not wander throughout the apartment at that point. Ms. Branch testified when she came out of the bathroom the officers were in possession of the three guns. . . .

. . . .

The court believes that the guns were in plain view. The defendant made several false statements in connection with the purchase of the gun in Colorado which undermine his credibility. He has the greatest motive to lie in this case. Moreover, a photograph of the bedroom closet in which the defense maintains the guns were kept indicates that it would be very hard for a stranger in such a brief period of time at night to find guns under the clothing that would have been hanging in the closet. . . .

It is much more plausible that the guns were in plain view as Officer Abousamra testified.

(Suppression Hearing Transcript, February 10, 1998 ("Feb. 10 Tr."), at 21–22.)

Following that decision, the parties agreed to waive a jury trial and stipulated

that the trial evidence as to the finding of the guns would be the evidence presented at the suppression hearing. They also stipulated, *inter alia*, that Kiyuyung had a prior conviction. The court warned Kiyuyung that the stipulated facts would virtually assure a verdict of guilty in a bench trial, and it gave him an opportunity to withdraw his jury waiver. Kiyuyung declined, and the case was tried to the court.

Kiyuyung was found guilty and was sentenced as indicated above.

## II. DISCUSSION

■ Kiyuyung has appealed, contending that his motion to suppress should have been granted because the government failed to establish that the guns were found in plain view. For the reasons that follow, we agree.

■ A warrantless search is " '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)); *see, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Under the "security check" exception, when law enforcement officers have lawfully entered premises in connection with an arrest, they are entitled to make a quick and limited "security check" of the premises to be sure there are no persons or objects on the premises to pose a safety threat to the officers. *See generally Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *United States v. Martino*, 664 F.2d 860, 875 n. 6 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *United States v. Vasquez*, 638 F.2d 507, 530 (2d Cir.1980), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981); *United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d

194 (1981). Under the "plain view" exception, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *see Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). Patently incriminating evidence that is in plain view during a proper security check may be seized without a warrant. *See, e.g., Minnesota v. Dickerson*, 508 U.S. at 375–76, 113 S.Ct. 2130; *see generally United States v. Vasquez*, 638 F.2d at 529 n. 14, 532.

■ If the place or object subjected to the warrantless search is one in which the defendant had a reasonable expectation of privacy, the burden of showing that the search fell within one of the exceptions to the warrant requirement is on the government. *See, e.g., United States v. Perea*, 986 F.2d 633, 639 (2d Cir.1993); *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981).

■ In the present case, even accepting the government's evidence that the three guns were found at the front edges of three shelves in the hall closet, rather than buried in the bottom of the bedroom closet as testified by Kiyuyung and Branch, the government did not meet its burden of showing that the guns were discovered because they were in plain view. The only witness called by the government was Abousamra, who was not the officer who found the first gun. If Abousamra had testified that he observed the guns in plain view while he was conducting his security sweep of the apartment, which included the path past the hall closet, the district court would have been entitled to find that the government had met its burden. However, while that had been Abousamra's

version of the events when he testified before the grand jury, he recanted that testimony at the suppression hearing and testified instead that the first discovery of a firearm was in fact made by Quiles.

But Abousamra did not testify that when Quiles found the first gun it was in plain view. He could not so testify of his own knowledge because he was not with Quiles when Quiles found the gun; according to Abousamra, Quiles found the first gun and then summoned Abousamra to look at it. Nor did Abousamra testify that Quiles told him Quiles had spied the gun in plain view; rather, when asked if he knew how Quiles had discovered the gun, Abousamra testified, "He just said, Paul, come over here and look what I found here, there is a gun right on the edge of the shelf right here." (Feb. 5 Tr. 18.) Further, although the hall closet clearly was open after Branch entered the bathroom, allowing Abousamra, in response to Quiles's summons, to go and see the gun Quiles found—and to see two additional guns "in plain view"—there was no evidence whatever that the closet doors were open before Branch entered the bathroom. Abousamra did not testify that the closet doors were open when he made his security check; he repeatedly said he did not even remember whether the closet had doors. The closet did have doors, and there was no evidence as to the position of those doors before Quiles saw the first gun, because Quiles was not called to testify.

We must say we think it quite surprising that a police officer inspecting the bathroom and the hallway leading to it for the very purpose of "mak[ing] sure there was no weapon[ ] of any sort" that an arrestee could pick up "while she walked through the apartment to get to the bathroom" (Feb. 5 Tr. 17), (a) would not notice if the doors to a closet adjacent to the bathroom were open, and (b) if the closet doors were open, would not notice or remember that one of those open doors partially blocked the entrance to and exit from the bath-

room he checked, and (c) if the doors were open, would not have noticed the presence in plain view of three guns. Apparently, then, the guns were not in plain view when Abousamra made his security check. In these circumstances, given the failure of Abousamra, during his protective inspection, to notice guns that he testified were later "pretty much right in front of [his] eyes" (Feb. 5 Tr. 18), one might have thought the government would call as a witness the officer who discovered the first gun, to have him testify as to how it came to be within his range of vision. Indeed, the district court expressed puzzlement as to the government's selection of witnesses:

> You called one officer at the [hearing] .... and you had at least one other officer you could have called. You didn't call him. I don't know why not.

(Hearing Transcript, March 27, 1998, at 4.) Although a range of possible reasons comes to mind, the record itself offers no explanation for the government's failure to call Quiles as a witness.

In sum, although the district court found that Abousamra testified that the guns were in plain view, Abousamra in fact did not testify that he saw the guns during his security search, did not testify that the closet doors were open before Branch entered the bathroom, did not testify that Quiles said the closet doors were open, and did not even venture to ascribe to Quiles a conclusory statement that the first gun had been in plain view. Since the government elected not to have Quiles testify, the only plain-view evidence in the record was that the guns were in plain view after Quiles found one.

We conclude that the government did not sustain its burden. We therefore vacate the judgment of conviction and the order denying Kiyuyung's motion to suppress, and we remand to the district court for further proceedings.

We leave it to the sound discretion of the district judge to determine whether or not to reopen the suppression hearing in

order to allow the government to present the testimony of Quiles. In any event, the parties are relieved of their evidentiary and jury-waiver stipulations, though they are of course free to enter into new agreements.

### CONCLUSION

We have considered all of the government's arguments in support of the denial of the suppression motion and have found them to be without merit. The judgment is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.

### ORDER GRANTING IN PART AND DENYING IN PART GOVERNMENT'S MOTION FOR MODIFICATION OF OPINION

The government, although not requesting a reconsideration of the merits of the appeal, has moved for several modifications of our opinion in this matter, *see* slip op. 1503–15. For the reasons that follow, we grant the motion in part and deny the motion in part.

### I. *Officer Abousamra's Grand Jury Testimony*

The government contends that the opinion's characterization of the record as reflecting that Officer Abousamra testified to the grand jury that, as between himself and Officer Quiles, Abousamra "had been the first to discover the guns" (slip op. 1507), "is not an accurate reflection of the proceedings before the grand jury" (government motion at 7 ("Abousamra was not asked in the grand jury who was the first to discover the guns, and did not answer that he was the first.")). The government states that Abousamra's grand jury testimony "can be viewed as giving the *misleading impression* that the officer found the guns on his initial sweep through the apartment or, in any event, before [Branch] used the bathroom." (Government motion at 8 (emphasis added).)

We express no view as to whether the grand jury testimony was "misleading"; we note that Abousamra testified to the grand jury that before he allowed Branch to use the bathroom he did a security check, and when asked whether he saw anything, he answered affirmatively, saying that he saw the three guns. Given, however, that Abousamra did not use the word "first" in describing his discovery of the guns to the grand jury, we will grant the government's motion for a modification of the opinion to the following extent. The passage at slip op. page 1507 reading

> On cross-examination, Abousamra testified that, although his grand jury testimony had been that he had been the first to discover the guns, having seen them during his initial security check of the apartment, in fact it was Quiles who had spied them first:

is deleted, and the following is inserted:

> On cross-examination, Abousamra testified that his grand jury testimony had been that he had seen the guns during his initial security check of the apartment:
>
> > Q. . . . .
> > "A. .... We entered her apartment, and before I let her use the bathroom, I did a quick visual search to make sure everything was okay for my safety.
> > "Q. Did you see anything?
> > "A. Yes. Right at the opening to the bathroom door there was a shelving unit and there were three guns on the shelving unit." Did you give that testimony?
> > A. Yes, I did.
>
> (Feb. 5 Tr. 33–34 (quoting Abousamra's grand jury testimony).) At the suppression hearing, however, Abousamra testified that in fact it was Quiles who had spied the guns first:

The government also contends that the opinion "unfair[ly]" states that Abousamra recanted his grand jury testimony. (Government motion at 9.) Our opinion stated:

If Abousamra had testified that he observed the guns in plain view while he was conducting his security sweep of the apartment, which included the path past the hall closet, the district court would have been entitled to find that the government had met its burden. However, while *that had been Abousamra's version of the events when he testified before the grand jury, he recanted that testimony at the suppression hearing* and testified *instead* that the first discovery of a firearm was in fact made by Quiles.

Slip op. 1513 (emphasis added). The government requests that the language here emphasized be deleted from the opinion. We deny that request. As the quoted portions of the grand jury testimony to be added to the opinion reveal, Abousamra testified to the grand jury that he did his initial security check before allowing Branch to enter the bathroom and saw the guns. He testified before the district court at the suppression hearing that he did not see the guns during his initial security check and that it was Quiles who first saw the guns. We see no error in the opinion and no reason for any other modification of the discussion of the grand jury testimony or the suppression hearing proceedings.

## II. *The Parties' Stipulations*

As indicated in our opinion, after the denial of Kiyuyung's motion to suppress the parties agreed to waive a jury trial and stipulated that the trial evidence as to the finding of the guns would consist of the evidence that had been presented at the suppressing hearing. In light of our decision to vacate the denial of the motion to suppress and the judgment of conviction, we stated that "the parties are relieved of their evidentiary and jury-waiver stipulations, though they are of course free to enter into new agreements." Slip op. 1515. The government requests that we not relieve the parties of those stipulations, urging that if the district court allows a reopening of the sup-

pression hearing and again denies the motion to suppress, Kiyuyung's conviction should simply be reinstated. Kiyuyung opposes the government's motion, arguing that he entered into the stipulations in order to save time and effort for the parties and the court while preserving his right to make what he (correctly) believed would be a meritorious challenge to the denial of his suppression motion. He argues that had the government presented sufficient evidence as to Quiles's discovery of the guns, he would not have insisted on going to trial but would have pleaded guilty in order to secure the maximum downward sentencing adjustment for acceptance of responsibility.

 We deny the government's motion for rescission of our ruling that the parties are relieved of their stipulations. In light of the gap in the government's evidence at the suppression hearing, Kiyuyung's motion to suppress should have been granted. Had it been granted, there would likely have been no trial, since the guns that Kiyuyung was charged with possessing would not have been admissible in evidence. Alternatively, if the government had called Quiles as a witness and the district court had denied the motion on the basis of sufficient evidence as to the initial discovery of the guns, it is entirely possible that Kiyuyung would, as he now asserts, have pleaded guilty in order to qualify for a more lenient sentence. To the extent that there is any uncertainty as to what motivated Kiyuyung to proceed to trial and to do so without a jury, and what course he would have chosen had the government's proof at the suppression hearing not been flawed, the onus of that uncertainty should be borne by the government, which had gained an unearned victory. As indicated in our opinion, the parties remain free to enter into the same or other stipulations.

Finally, we reject the government's suggestion that the parties should be held to their evidentiary stipulations. We would think it entirely inappropriate to rule that

a party who has stipulated that evidence that *was* presented at a hearing may constitute part of the trial record, is bound either to concede the admission of belatedly-produced evidence that *had not* been presented at the time of the stipulation, or to forgo introducing later evidence that he might consider to be favorable to him.

The government's motion for modification is granted to the extent indicated above and is in all other respects denied.