**UNITED STATES of America**

v.

**Richard NELSON, Defendant.**

**No. 04 CR 21(VM).**

United States District Court, S.D. New York.

May 29, 2007.

Barry Turner, Barry Turner, Esq., New York, NY, Steven M Statsinger, Federal Defender Division Legal Aid Society, New York, NY, for Richard Nelson.

Sarah Y. Lai, U.S. Attorney's Office, SDNY (St Andw's), New York, NY, for U.S.

## DECISION AND ORDER

MARRERO, District Judge.

Defendant Richard Nelson ("Nelson") was convicted on March 16, 2005 of being a

felon in possession of two firearms in violation of 18 U.S.C. § 922(g)(1), after a federal agent and other law enforcement officers found two guns in his apartment. On July 16, 2004, Nelson filed a Motion to Suppress Evidence ("Motion to Suppress") pursuant to Fed.R.Crim.P. 12 that was subsequently denied, without a hearing, pursuant to this Court's order, dated September 15, 2004. On August 10, 2006, the Second Circuit affirmed Nelson's conviction and sentence, but remanded the case for an evidentiary hearing on Nelson's Motion to Suppress. This Court held the evidentiary hearing on January 19, 2007. For the following reasons, Nelson's motion is denied.

## I. BACKGROUND [1]

On or about October 9, 2003, Special Agent Dan Parsons ("Parsons") of the Drug Enforcement Administration ("DEA") received information from a confidential source that the first floor apartment at 1351 Noble Avenue, Bronx, New York (the "Apartment"), might contain narcotics. Based on this information, Parsons and his partner John Shannon ("Shannon") (collectively, the "DEA Agents") went to the Apartment, later followed by New York City Police Department ("NYPD") Detectives Robert Rodriguez ("Rodriguez") and Kevin Spellman ("Spellman") (collectively, the "NYPD Officers") and other law enforcement officers. A woman, Gloria Madden ("Madden"), also known as "Samba"—the name provided by the confidential source—answered the door and Parsons requested identification to determine whether Madden was the

person mentioned by the police informant. Madden was holding a small child; Nelson also stood at the door with another small child standing next to him.

As Madden went to her bedroom in the rear of the Apartment to retrieve identification, the DEA Agents followed her and detected the odor of raw marijuana while walking through the Apartment. Madden eventually produced an expired visa and presented it to Parsons. After Madden confirmed that she knew the visa was expired, the DEA Agents asked if there was a place where they could sit and talk. Madden led them to kitchen, where a digital scale and packaging materials were located. During this conversation in the kitchen, Parsons explained to Madden that he wanted consent to search her residence and began to fill out a consent-to-search form in front of Madden.

While Madden, Parsons, and Shannon spoke in the kitchen, the NYPD Officers entered the Apartment and requested that Nelson, who had remained in the living room, sit down on a nearby couch. Shortly thereafter, Nelson requested to go to the bedroom, where a child was sleeping on the bed, and Rodriguez asked if he would refrain from doing so at that moment. After Nelson followed up with several requests to go to the bedroom, Rodriguez asked if there was anything in the bedroom that "shouldn't be there." (Supp. Hrng. Tr. 45). Nelson initially responded in the negative, but later admitted that there was a gun in an armoire in the bedroom. Rodriguez asked where the gun was located and retrieved the weapon.

---

1. The factual recitation set forth below derives from the Trial Transcript, dated March 14–16, 2005 ("Tr."); the Suppression Hearing Transcript, dated January 19, 2007 ("Supp. Hrng.Tr."); Defendant's Memorandum of Law in Support of the Motion to Suppress Evidence, dated February 23, 2007 ("Def.'s Mem."); and the Government's Submission in Opposition to the Motion to Suppress Evidence, dated March 2, 2007 ("Gov't Mem."). Except as quoted or otherwise specifically cited below, no further references to these documents will be made.

Upon being asked by Rodriguez again whether there was anything else in the bedroom that he should be made aware of, Nelson informed Rodriguez that there was a second gun in the same bedroom armoire. After Rodriguez found the second gun where Nelson said it was, Spellman handcuffed and arrested Nelson.

Nelson argues that neither he nor Madden gave the officers permission to search the Apartment, and thus all evidence seized from the Apartment should be suppressed.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

Rule 12(b) of the Federal Rules of Criminal Procedure requires that, prior to trial, a defendant raise any defenses or objections based on defects in the indictment and make motions to suppress evidence or request discovery. *See United States v. Crowley*, 236 F.3d 104, 108 (2d Cir.2000). The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. *See Simmons v. United States*, 390 U.S. 377, 389–90, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). If it is established that the challenged search was made without a warrant, the burden shifts to the Government to prove that the warrantless search was conducted pursuant to an exception to the warrant requirement. *See United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir.1999); *see also United States v. Perea*, 986 F.2d 633, 639 (2d Cir.1993) (internal citations omitted).

### B. *CONSENT TO ENTER AND SEARCH MADDEN'S APARTMENT*

1. *Consent to Enter Madden's Apartment*

■ The first issue raised in Nelson's Motion to Suppress is whether, in fact, Madden permitted the DEA Agents' entry into her Apartment. As this Court indicated, "a search is different from an entry, and the Fourth Amendment does not apply to entry with the consent of the inhabitant." *United States v. Nelson*, 335 F.Supp.2d 477, 479 (S.D.N.Y.2004) (*citing Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990))(noting that the Fourth Amendment prohibition against warrantless entry of a home "does not apply ... to situations in which voluntary consent has been obtained ... from the individual whose property is searched"). In this instance, Parsons claims that Madden invited him into her home as she went into her bedroom to retrieve the requested identification. (Supp.Hrng. Tr. 14). Madden claims that she did not give Parsons and Shannon verbal consent to enter the Apartment, but rather that they simply entered and followed her to her bedroom after requesting identification from her. (*See* Def.'s Mem. at 1.)

Consent "need not be expressed in a particular form, but 'can be found from an individual's words, acts or conduct,'" *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir.1993)(*quoting Krause v. Penny*, 837 F.2d 595, 597 (2d Cir.1988)). Citing *Deutsch*, where a defendant's entrance into his home after communicating to officers that his identification was located inside his residence indicated a clear invitation to enter, the Government claims that Madden's decision to turn from the officers, go to her bedroom, and retrieve the identification requested amounted to consent for them to enter her Apartment. This proposition raises difficulties, as an inhabitant's perfunctory compliance with a police officer's request for identification at the door of the residence, without more, seems to be a thin basis on which to determine that

consent for law enforcement agents to enter the premises had been granted.

In this instance, however, Madden's subsequent conduct belies Nelson's claim that she did not grant permission to enter to the DEA agents. She allowed the officers to follow her a significant distance into the Apartment—permitting them to come through the living room, down the hallway, past the kitchen, and into the back bedroom—without registering any objection to their presence. (Supp.Hrng. Tr. 14). She also testified that she "[drew] the door but [she] didn't turn the lock to [have them] wait for the ID," implying that she knew that her decision not to do so might result in entry into her Apartment by the DEA Agents. (Tr. 136). Thus, although Madden claims that she did not offer the DEA Agents a verbal invitation into her Apartment, her sustained lack of objection to their presence, coupled with her testimony that she could have barred the DEA Agents from entering but chose not to do so, established conduct that sufficiently expressed her consent to enter.

### 2. Consent to Search Madden's Apartment

A warrantless search and seizure is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Kiyuyung*, 171 F.3d at 83 (*quoting Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)) (citations omitted). One such exception applies to consensual searches, which have consistently been approved by courts based on the logic that it is "reasonable for the police to conduct a search once they have been permitted to do." *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Such consent must be indicative of an individual's "free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United*-ed States v. Garcia*, 56 F.3d 418, 422 (2d Cir.1995)(*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Whether an individual has consented to a search is a question of fact dictated by "totality of all the circumstances." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir.1993) (*quoting Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041).

Here, Madden acknowledges that she signed a consent-to-search form, but disputes the conditions that accompanied the consent provided. She stated that she did not read the form; that she was nervous and scared while signing; and that she was not asked to sign the form until after the search of her Apartment was completed. (Tr. 139–42). Parsons stated that he asked for and received her verbal consent to search, immediately before requesting her signature of the form. (Supp.Hrng. Tr. 18). He further testified that the time of 2:56 p.m. listed on the consent form was also the time at which Madden signed the form. (*See id.; see also* Government's Exhibit 2 ("GX–2"), offered at Supp. Hrng.)

The Court is not persuaded by Madden's alleged version of events surrounding her decision to sign the consent form. First, the form itself is quite simple. It consists only of three statements in capital letters that acknowledge that: 1) she had been asked permission to allow DEA agents to search her residence; 2) she had not been threatened or forced in any way to grant permission; and 3) she freely consented to the search. (*See* GX–2). It lists in bold letters at the top of the form "CONSENT TO SEARCH." (*See id.*) Even a cursory glance at the form, without the explanation provided by the DEA Agents, would have indicated its purpose.

The facts also do not support any purported claims of coercion. Madden testified that she was "nervous" and "fright-

ened" when she signed the consent-to-search form. (Tr. 142). While such an emotional state is understandable given the events occurring in Madden's home at the time, it does not rise to coercion and does not place the consent provided by way of her signature into question. *See United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (finding consent to search voluntarily offered despite formal arrest); *see also United States v. Marin*, 669 F.2d 73, 82 (2d Cir.1982) (same); *Garcia*, 56 F.3d at 423 (finding that the presence of three law enforcement officers does not lend significant support to a claim of coercion). Madden does not claim that she was threatened, physically restrained, or otherwise forced to sign the document; hence, her consent cannot be challenged on the basis of coercion. *See United States v. Lavan*, 10 F.Supp.2d 377, 384 (S.D.N.Y.1998)(listing show of force, use of handcuffs, previous refusal to consent, and threat of more expansive search warrant as factors in determining the voluntariness of consent).

Finally, the Court finds that the timeline put forth by Madden is not credible. Madden claims that she signed the form after the completion of the search. (Tr. 139). Parsons testified that he arrived at her home at approximately 2:45 p.m. (Supp. Hrng. Tr. 12). She signed the form at 2:56 p.m., a fact which was uncontested during both the trial and the suppression hearing. Parsons indicated that the search lasted for at least 45 minutes and that he spoke with Madden for the duration of that time period, in part because they were awaiting the arrival of a canine, purportedly to sniff out the presence of other illegal substances that may have been in the Apartment. (*Id.* 21). Madden offered no testimony as to when she believed the form was actually signed, nor does she recount protesting the search that ensued for such a substantial period of time, allegedly without her consent. *See, e.g., United States v. Sanchez*, 635 F.2d 47, 55 (2d Cir.1980)(citing the absence of objection by all occupants of an apartment as a significant factor in finding consent to enter had been granted). The Court finds Madden's testimony on this issue implausible and unsupported by the record. Thus, the Court concludes that Madden consented to the search of her Apartment.[2] That consent presumably extended to the search of the bedroom where the guns revealed by Nelson were located. Accordingly, there is insufficient ground to suppress the evidence of the guns.

### C. PRE–MIRANDA QUESTIONING OF NELSON AND FIREARMS SEIZURE

#### 1. Applicability of Public Safety Exception

In *New York v. Quarles*, 467 U.S. 649, 659, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984),

---

**2.** The Court notes Nelson's supposition that the intent of the DEA Agents to identify Madden by the DEA Agents was merely a cover for their ultimate intent to search the premises without a search warrant. (Def.'s Mem. at 2, 5–7.) Shannon testified, "We were going [to Madden's Apartment] to attempt to gain consent to search." (Tr. 85). Parsons, on the other hand, testified that his intent was merely to "[a]ttempt to identify the residents." (Supp.Hrng. Tr. 12, 25). Regardless of the intent of either DEA Agent, upon their arrival, Madden provided such consent voluntarily. *See* Section II, B(1) *supra.* Her testimony provides no indication of coercion or threats. Upon requesting identification from Madden, the DEA Agents were allowed into her home, wherein they detected the smell of raw marijuana, providing the basis for the request for consent to search. (Supp.Hrng. Tr. 16). While the Court is wary of pretextual efforts by police officers to push for consent to search where there is not enough probable cause for a search warrant, the record here simply does not bear out evidence of intent to force Madden to provide consent or attendant manipulation by Parsons or Shannon.

the Supreme Court carved out a narrow *Miranda* exception when arresting officers ask a defendant "questions necessary to secure their own safety or the safety of the public." *See also United States v. Newton,* 369 F.3d 659, 678 (2d Cir.2004). The exception permits pre-*Miranda* inquiries of defendants that are "reasonably prompted by a concern" for public safety and are to be "circumscribed by the exigency which justifies it." *Quarles,* 467 U.S. at 656, 104 S.Ct. 2626. Concern for an officer's bodily safety upon arriving at a suspect's residence, especially when narcotics are involved, constitutes a legitimate safety reason for asking whether there might be any weapons or other items that could harm the officers in a residence. *See United States v. Reyes,* 353 F.3d 148, 154 (2d Cir.2003)(collecting cases); *see also United States v. Wiener,* 534 F.2d 15, 18 (2d Cir. 1976) (acknowledging that firearms are often found on the premises of a narcotics dealer).

In *United States v. Estrada,* 430 F.3d 606 (2d Cir.2005), the Second Circuit clearly identified three principles that outline the public safety exception in any given case. First, the exception is not limited to the safety of the general public, but rather encompasses situations in which only the safety of police officers is at issue. *See id.* at 612 (*citing Quarles,* 467 U.S. at 658–59, 104 S.Ct. 2626). Second, the police officer's questions must not be carefully phrased so as draw out testimonial evidence. *See id.* "Thus, a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety." *Id.* Finally, the application of the public safety exception is fact-specific, necessitates flexibility, and is essentially, " 'a function of the facts of cases so various that no template

is likely to produce sounder results than examining the totality of the circumstances in a given case.' " *Id.* at 152 (*quoting United States v. Banks,* 540 U.S. 31, 36, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003)).

■ When Rodriguez and Spellman entered the apartment, they surveyed the scene and began to speak with Nelson. They knew that the investigation likely involved narcotics, and consequently firearms and potential fugitives, because of their previous working relationship with Parsons. (Supp.Hrng. Tr. 20, 80–81); *see also United States v. Becerra,* 97 F.3d 669, 671–72 (2d Cir.1996). Nelson also appeared to be nervous while asking to go to the bedroom on three separate occasions. (Supp.Hrng. Tr. 45). Only after the third request did Rodriguez ask if there was anything in the Apartment that should not be there. (*See id.*) Recalling their past experiences in assisting Parsons and observing Nelson's heightened anxiety specifically related his requests to enter the bedroom, the NYPD officers clearly asked questions intended to secure the safety of the police officers.

The questions evidenced no investigative intent, but rather were generated in specific response to Nelson's behavior and were "aimed at controlling a potentially dangerous situation and relieving and immediate threat to the officers' safety." *Estrada,* 430 F.3d at 613; *see also United States v. Williams,* 181 F.3d 945, 953–954 (8th Cir.1999) (admitting statements of a narcotics defendant arrested in his apartment who was asked by the police "is there anything we need to be aware of?"). Each of Nelson's firearms was located where Nelson had indicated only after the safety-related inquiry from Rodriguez, rather than sweeping, investigative queries, as demonstrated by Rodriguez's inability to find the second weapon without ex-

plicit direction from Nelson. Given the reasonable belief that the premises might contain firearms because of the presence of narcotics, Nelson's increasingly anxious demeanor and conduct, and the circumscribed scope of Rodriguez's questioning, this case fits the public safety exception outlined in *Quarles*.

### 2. *Seizure of Nelson's Firearms*

■ After Nelson informed the NYPD Officers of the presence of firearms, they were entitled to seize them, even in the absence of a search warrant. "It is well-settled ... that the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay." *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990). The Second Circuit delineated six factors to guide analysis of whether "law enforcement agents were confronted by 'an urgent need' to render aid or take action." *Id.* at 768 (*quoting Dorman v. United States,* 435 F.2d 385, 391 (D.C.Cir.1970)). The *MacDonald* factors are as follows:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe the that the suspect is in the premises being entered; (5) a likelihood that suspect will escape if not swiftly apprehended; (6) the peaceful circumstances of the entry.

916 F.2d at 770 (internal quotations and citations omitted). This list is not intended to be exhaustive, nor does it indicate the weight to be applied to the presence or absence of any one factor. Instead, it is "an illustrative sampling of the kinds of facts to be taken into account." *Id.*

Here, the NYPD Officers discovered, by way of Nelson's own admission, the presence of two loaded firearms in a small apartment where at least two young children were located, in addition to a number of officers conducting the search to which Madden had, at that point, consented. In that Nelson alerted the NYPD Officers to the location of the firearms, they had probable cause to believe that he committed the crime of unlawful possession of those guns. The likelihood of Nelson's fleeing the premises quickly also seemed a reasonable conclusion, since neither Rodriguez nor Spellman recalled knowing whether or not Nelson actually lived at the home during their initial questioning. (Supp.Hrng. Tr. 43, 70). Finally, neither the NYPD Officers' entry into the Apartment nor into the bedroom to search for the weapons as directed by Nelson were contentious. (Supp.Hrng. Tr. 45–48).

Most instructive, however, was the continued exchange between Nelson and Rodriguez. (*See id.*) After admitting to the presence of the first firearm, Nelson specifically guided Rodriguez to its precise location in the bedroom. At that point, Nelson was certainly on notice of the NYPD Officers' intent to search for and seize any items that might pose a danger to themselves and other officers during the ongoing search. Nelson's conduct confirmed his knowledge of such a search by the NYPD Officers; in fact, Rodriguez could not locate the second firearm without detailed instruction from Nelson. (Supp. Hrng. Tr. 47). Such cooperation implies Nelson's consent to the seizure of the second gun.

### III. *ORDER*

For the reasons set forth above, it is hereby **ORDERED** that Nelson's motion

to suppress evidence pursuant to Fed. R.Crim.P. 12 is DENIED.

**SO ORDERED.**