UNITED STATES of America

v.

David DELVA, Defendant.

No. 12 Cr. 802(KBF).

United States District Court, S.D. New York.

Signed March 11, 2014.

270

Parvin Daphne Moyne, Timothy Donald Sini, United States Attorney Office, New York, NY, for United States of America.

Jeffrey G. Pittell, Attorney at Law, Great Neck, NY, for Defendant.

### MEMORANDUM DECISION & ORDER

KATHERINE B. FORREST, District Judge.

Before the Court is defendant David Delva's motion to suppress his cellular telephone (the "Cell Phone"),[1] which was seized by law enforcement officers on June 4, 2013. During an arrest of another individual, certain items were seized as evidence of a crime, and in plain view. Among the items seized were a gun and drugs belonging to Delva; he previously moved unsuccessfully to suppress that evidence. (*See* ECF Nos. 75, 92.)

On June 4, 2013, law enforcement entered the apartment located on the second floor of 832 South Oak Drive, Bronx, New York (the "Apartment") to arrest one of Delva's roommates, Gregory Accilien. Accilien was alleged to have participated in a brutal robbery and kidnapping. At the time of the arrest, the officers who entered the Apartment knew that one or more cell phones had been used during the robbery and kidnapping. Delva was later arrested for participation in the same offense and his trial on those charges is scheduled to commence on June 23, 2013.[2]

On January 21, 2014, this Court held an evidentiary hearing with respect to seizure of the items from the Apartment. During that hearing, evidence relating to the sei-

zure of two cell phones, one of which was later determined to belong to Delva, was adduced. Delva's counsel then amended his original motion to suppress (as to drugs and a loaded gun) to add a motion to suppress the Cell Phone. (*See* January 21, 2014 Hearing Transcript ("Tr.") at 100.) The Court requested additional briefing on this additional motion. That briefing was fully submitted on February 26, 2014. (ECF Nos. 95, 102, 114.)

There is no factual dispute that the Cell Phone is Delva's. Further, defendant has proffered no evidence, nor elicited any evidence on cross-examination, that at the time it was seized, the Cell Phone was not in plain view in a bedroom that had been occupied the previous night by Accilien (the robbery and kidnapping suspect).

The Government does not base the legality of its seizure of the Cell Phone on the receipt of consent to search the bedroom. According to the Government, during the course of legitimate efforts incidental to a protective sweep that was itself incident to the arrest of Accilien, law enforcement officers ("Officers") saw drugs, a gun, and the Cell Phone in plain view. It is undisputed that the Officers saw the drugs and gun prior to seeing the Cell Phone.

Delva's arguments on this motion are the same as those on his prior motion with respect to the gun and drugs: (1) the Officers' had no need or right to enter the Apartment; (2) once in the Apartment, the Officers had no right to enter the bedroom

---

**1.** As is discussed *infra*, two cell phones were seized as part of the search, one of which is Delva's.

**2.** On October 8, 2013, a grand jury returned Superseding Indictment S1 12 Cr. 802 against Delva, which charged him with seven criminal counts: conspiracies to commit Hobbs Act robbery and kidnapping, the Hobbs Act robbery and kidnapping them-

selves, the possession or use of a firearm in furtherance of these conspiracies in violation of 18 U.S.C. § 924(c)(1)(A)(i), conspiracy to distribute various controlled substances (marijuana, crack, and cocaine) in violation of 21 U.S.C. § 846, and the possession or use of a firearm in furtherance of this narcotics conspiracy in violation of 18 U.S.C. § 924(c)(1)(A)(i). (ECF No. 50.)

which the defendant shared with others; (3) that the Cell Phone, which was recovered in the bedroom, was not in plain view; and (4) even if the Cell Phone was in plain view, it was not in and of itself contraband, evidence of a crime, or associated with evidence of a crime.

At the evidentiary hearing on January 21, 2014, the Government called Special Agent John Reynolds of the Federal Bureau of Investigation ("FBI") who was the lead investigator with respect to this robbery and kidnapping, and Detective Ellis Deloren of the New York Police Department ("NYPD"), who was the lead detective in that investigation. The only testimony elicited about the location and seizure of the two cell phones was from Special Agent Reynolds. (Deloren knew that cell phones had been seized but no more than that.) The defendant called one of his other roommates in the Apartment as of the date of the search, Mackenzie Bruno. Bruno had also been an occupant of the bedroom the previous night and may have had information regarding the cell phones. Bruno presented no testimony regarding the cell phones.

For the reasons set forth below, Delva's motion to suppress is DENIED.

## I. FACTS

The facts relevant to resolution of this motion were established at the evidentiary hearing on January 21, 2014. They are recited in this Court's January 27, 2014, 2014 WL 465149, decision on defendant Delva's first motion to suppress (*see* Decision at 3–8, ECF No. 92), and are incorporated herein by reference. Only those facts necessary to context and resolution of this motion are set forth herein.

As the Court previously noted in its January 27, 2014 decision, it found both of the Officers who testified—Reynolds and

Deloren—very credible. Reynolds has worked for the FBI for six years. Prior to that, he was a police officer with the NYPD for six years. Detective Deloren is assigned to the NYPD's Bronx robbery squad. He has been with the NYPD for over fourteen years and has been a detective since 2009.

On June 4, 2013, approximately ten officers arrived at the Apartment to execute an arrest warrant for Accilien. (Tr. at 59.) Deloren and Reynolds knew that Accilien had a significant criminal history, that he was being arrested in connection with a brutal robbery and kidnapping which had occurred over the course of several days, and that these events involved serious bodily injury and a sexual assault. (*Id.* at 9, 57.) Deloren and Reynolds knew that guns were used in connection with these crimes. (*Id.* at 9, 57.) Reynolds testified that Accilien had previously been charged with assaulting a police officer. (*Id.* at 9.) On the day the Officers were executing the arrest warrant, Deloren believed that Accilien could be dangerous. (*Id.* at 58.) Reynolds and Deloren were armed and wearing bulletproof vests. (*Id.* at 10, 59.)

The building at 832 South Oak Drive, in which the Apartment is located, is a two-story building. (*Id.* at 10.) The Apartment is on the second floor, which was accessible through an outer door at street level, (*Id.* at 10–11.) The outer door entered onto a staircase that leveled off at a landing adjoining the kitchen. (*Id.* at 10–11.) There was no interior door between the stairs and the kitchen. (*Id.* at 15, 60.) The Apartment was about 500 square feet in total, consisting of a kitchen with a bedroom/living room off it on the far right, a second bedroom off it on the far left, and a bathroom at the far end. (*Id.* at 15, 60.)

The Officers knocked on the outer door and announced; "Police department.

Open up the door." (*Id.* at 61.) Deloren looked through a semi-circular window on the outer door and saw a man start down the stairs and then retreat back up the stairs. (*Id.* at 17, 61.) The Officers broke down the door. (*Id.* at 18, 61.) Reynolds announced "police" as he entered the residence and began to climb the stairs. (*Id.* at 18.) His gun was drawn. (*Id.*) Deloren was directly behind him, and there were additional Officers behind Deloren. (*Id.* at 63.)

As Reynolds was climbing the stairs, he could see Accilien at the top of the stairs looking down at him. (*Id.* at 18.) Both Reynolds and Deloren were stating: "Police, get down." (*Id.* at 63.) Accilien complied and lied down on the floor in the kitchen. (*Id.* at 18, 63–64.) As Reynolds reached the top of the stairs, he saw two other men in the kitchen; Reynolds stepped further into the kitchen and instructed the two other men to get down. (*Id.* at 22.) The kitchen was very small. (*Id.* at 25.) Reynolds then noticed somebody in the second bedroom—the bedroom closest to the bathroom and off the kitchen. (*Id.* at 23.) Reynolds later identified the individual as Delva. (*Id.*) Reynolds was standing in the kitchen and saw Delva walking towards the kitchen from inside the second bedroom. (*Id.*) Deloren also noticed that Delva was in the second bedroom and was walking towards the kitchen. (*Id.* at 65–66.)

Reynolds instructed Delva to get down on the ground. (*Id.* at 25.) Delva did not immediately comply; Reynolds had to instruct him several times, and he did eventually comply. (*Id.*) When Delva was lying on the ground, his head was in the bedroom near the doorway, with the rest of his body and legs stretching behind him into the bedroom. (*Id.* at 25–26.) Reyn-

olds then stepped either to the side of Delva or over Delva to make sure no one else was in the room. (*Id.* at 26, 31.) Reynolds testified that he could not see the entire bedroom from the kitchen and needed to enter the bedroom to determine if anyone else was in that room and whether there could be any threats coming from that room. (*Id.* at 27, 31.)

When Reynolds entered the bedroom and looked to see if anyone else was present, he noticed a closet, the door of which was ajar. (*Id.* at 27.) He saw what he believed to be drugs on the floor of the closet. (*Id.*) Immediately thereafter, Deloren entered the bedroom. (*Id.* at 67.) He saw that Delva was on the ground, his body completely inside the bedroom. (*Id.*) Reynolds was focused on Delva and told Deloren about the bag in the closet. (*Id.*) Deloren stated that the closet door was open when he approached it. (*Id.* at 68.) He could see the floor of the closet and saw a clear, plastic bag with a white powdery substance in it; based on his experience he believed it to be cocaine. (*Id.*) Deloren bent down to pick the bag up and saw that just to the side of it, only a few inches away, was a sneaker with a firearm in it. (*Id.*) The gun was inserted barrel-first into the shoe. (*Id.* at 69.) Deloren then quickly recovered the gun and made it safe by removing the magazine and emptying the chamber. (*Id.* at 69–70.)

Reynolds then moved Delva into the kitchen with the others. (*Id.* at 29.) Only two minutes had elapsed between the time the Officers entered the Apartment and the Apartment was secured with the men in handcuffs in the kitchen.[3] (*Id.* at 43, 72.) Reynolds and Deloren then brought Accilien into the bedroom and asked him to identify the other people in the Apart-

---

**3.** Reynolds and Deloren testified that a woman and two children were also at the apart-

ment; they were in the first bedroom/living room off of the kitchen. (*Id.* at 67.)

ment; Accilien identified Delva as his nephew and the closet in the bedroom as belonging to Delva. (*Id.* at 70–71.) Accilien gave the Officers oral consent to search the bedroom, where he had spent the previous night. (*Id.* at 52, 71, 84, 86–87.)

The Apartment was small. (*Id.* at 15.) Two Officers stepped into the bedroom with Accilien to ask him who the other individuals were and to whom the items in the closet belonged. (*Id.* at 70–71.) While that was occurring, the Officers noticed and seized a letter and two cell phones. (*Id.* at 82, 87.) The two cell phones were in plain view: one on a television stand and the other on the bed. (*Id.* at 99.) At about the same time, Reynolds also saw an envelope in plain view with Accilien's name as the addressee. (*Id.* at 89, 92.) Reynolds saw that the sender of the envelope was one of the suspects in the same robbery and kidnapping; the letter had been sent from the sender's place of incarceration. (*Id.* at 88–89.) While the cabinet on which the letter was located had a number of items on it, Special Agent Reynolds testified credibly that there was room for the letter to be in plain view on the cabinet with the address information visible. (*Id.* at 91.)

It is undisputed that the contents of the Cell Phone were only searched after a warrant was obtained. (*Id.* at 101.)

## II. APPLICABLE LEGAL STANDARDS

 "Generally, the police do not need a search warrant to enter a suspect's home when they have an arrest warrant for the suspect." *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir.1995) (citing *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). Accordingly, "[a]gents may enter a suspect's residence, or what they have reason to

believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present." *Lauter*, 57 F.3d at 214 (citations omitted).

Here, there is no dispute that the Officers were in possession of a valid arrest warrant for Accilien. There is also no dispute that the Officers reasonably believed Accilien to be present in the Apartment—it was Accilien's last known address, and Accilien himself opened the door previously when Deloren went to the Apartment. However, once the Officers entered the premises at 832 South Oak Drive, there are two additional issues: (1) were the Officers entitled to conduct a "protective sweep" of the Apartment, including the bedroom in which the defendant was located; and (2) were the Officers entitled to seize the Cell Phone, which Special Agent Reynolds testified he saw in plain view in the defendant's bedroom. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 28, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all.")

 The Fourth Amendment protects persons against *unreasonable* searches and U.S. Const. amend. IV (emphasis added). This is a basic constitutional right that "belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry*, 392 U.S. at 8–9, 88 S.Ct. 1868; *see also United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.1994). "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35

L.Ed. 734 (1891). "Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct." *Terry*, 392 U.S. at 12, 88 S.Ct. 1868.

 Evidence seized in violation of the Fourth Amendment is subject to exclusion at trial. *Id.* at 13, 88 S.Ct. 1868. This has the advantage of insuring judicial integrity and protecting courts from being made a party to "lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasion." *Id.* at 13, 88 S.Ct. 1868. In the absence of a warrant or the applicability of an exception, law enforcement does not have a general right to enter one's home, rifle through drawers, and take what might be found therein. *See, e.g., United States v. Jenkins*, 876 F.2d 1085, 1088 (2d Cir.1989.) The defendant here argues that is essentially what occurred at the Apartment on the morning of June 4, 2013.

The Warrant Clause of the Fourth Amendment recognizes that judicial approval of seizures of the person do not run afoul of a person's constitutional right to be free from such restraint. U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); *see also Terry*, 392 U.S. at 20, 88 S.Ct. 1868; *Katz v. United States*, 389 U.S. 347, 354–57, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

 When police officers validly enter a residence, such as in aid of executing an arrest warrant, facts and circumstances incident to that entry may provide them with legal authority to ensure their own safety by performing a "protective sweep." *See Maryland v. Buie*, 494 U.S. 325, 334–36, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990);

*Lauter*, 57 F.3d at 216; *see also United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir.1999) ("Under the 'security check' exception, where law enforcement officers have lawfully entered premises in connection with an arrest, they are entitled to make a quick and limited 'security check' of the premises to be sure there are no persons or objects on the premises to pose a safety threat to the officers.") In appropriate circumstances, a protective sweep does not constitute an unreasonable search in violation of the Fourth Amendment, *See, e.g., Terry*, 392 U.S. at 9, 88 S.Ct. 1868; *Kiyuyung*, 171 F.3d at 83; *Lauter*, 57 F.3d at 216.

 When law enforcement are engaged in otherwise lawful activities (such as the execution of a valid arrest warrant), and see illegal or evidentiary items in plain view, they may seize them without a warrant. *Scopo*, 19 F.3d at 782; *Kiyuyung*, 171 F.3d at 83 ("Under the 'plain view' exception, 'if police are lawfully in a position from which they may see an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'") (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)). "Patently incriminating evidence that is in plain view during a proper security check may be seized without a warrant." *Kiyuyung*, 171 F.3d at 83; *see also Dickerson*, 508 U.S. at 375–76, 113 S.Ct. 2130. This is referred to as the "plain view" exception to the warrant requirement.

 This exception has three elements: (1) the evidence must, in fact, be in plain view; (2) the officers who seize such evidence must not have violated the Fourth Amendment in arriving at the place in which the evidence is plainly viewed; and (3) the incriminating charac-

ter of the evidence must be immediately apparent. *See Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *see also Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Delibac,* 925 F.2d 610, 613 (2d Cir.1991).

 The plain view doctrine applies to objects which are not in and of themselves contraband, so long as the incriminating nature of the object is readily apparent or the object is or contains evidence of a crime. *See Arizona v. Hicks,* 480 U.S. 321, 327–28, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 306–307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). There must be a nexus between the item seized and criminal conduct; when the object is seized as evidence of a crime, whether or not probable cause existed at the time of its seizure must be examined in terms of whether there was cause to believe that the evidence sought would aid in a particular apprehension or conviction. *Warden, Md. Penitentiary,* 387 U.S. at 306–307, 87 S.Ct. 1642.

 Thus, under the plain view doctrine, the incriminating nature of an object is generally deemed "readily apparent" where law enforcement have reason to believe it is or contains evidence of a crime. *See United States v. Ochs,* 595 F.2d 1247, 1258 (2d Cir.1979); *see also Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

 It is not necessary that an officer know with certainty that an object seized is or contains evidence of a crime at the moment of seizure; it is enough that there be probable cause to associate the object with criminal activity. *See Texas v. Brown,* 460 U.S. 730, 741–42, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). This rule reflects the impracticality of requiring police—once they have determined that such probable cause exists—to desist from seizure and take the time to obtain a search warrant, perhaps compromising the evidence or causing needless expenditure of time and resources. *See Coolidge,* 403 U.S. at 468, 91 S.Ct. 2022. The law therefore allows the police, once lawfully in a place and perceiving a suspicious object, to seize it immediately. *Brown,* 460 U.S. at 739, 103 S.Ct. 1535.

 Whether an object is perceived as evidence or containing evidence of a crime depends on the assessment of the law enforcement officer at the scene. *United States v. Barrios–Moriera,* 872 F.2d 12, 17 (2d Cir.1989). Ordinary, everyday objects such as cell phones, laptops, and cameras may take on a different character depending on the context in which they are found. *See United States v. O'Brien,* 303 Fed. Appx. 948, 949 (2d Cir.2008) (affirming denial of suppression of computer, where "police officers were lawfully present . . ., the computer was in plain view, and, based on the information known to them at the time, the officers had probable cause to seize the computer."); *United States v. Agbodjan,* 871 F.Supp.2d 95, 101 (N.D.N.Y.2012). Courts have routinely denied motions to suppress the seizure of cell phones, in the context of narcotics conspiracies, based on knowledge that the phones may contain contacts and other evidence of a crime. *See United States v. Meregildo,* No. 11 Cr. 576(WHP), 2012 WL 4378047, at *3–4 (S.D.N.Y. Sept. 24, 2012); *United States v. Chervin,* 10 Cr. 918(RPP), 2011 WL 4373928, at *5 (S.D.N.Y. Sept. 20, 2011); *United States v. Reyes,* No. 3:06 Cr. 120(SRU), 2007 WL 419636, at *6 (D.Conn. Jan. 30, 2007); *United States v. El–Gheur,* No. 91 Cr. 328(LBS), 1991 WL 197559, at *5 (S.D.N.Y. Sept. 24, 1991).

## III. ANALYSIS

This Court previously determined that the Officers entry into both the Apartment and the bedroom in which the defendant had been living was lawful. (Decision at 13–14.) The Court also previously determined that the drugs and gun which the Officers seized were in plain view. (*Id.* at 15.) No facts have been proffered disputing the fact that the cell phones were observed by Special Agent Reynolds in plain view on a table and on the bed in the bedroom in which Delva was arrested.

 There were multiple lawful reasons why the Officers had probable cause to believe that the Cell Phone was evidence of or contained evidence of criminal activity: the Officers were in the Apartment to arrest a man (Accilien) whom they were arresting for kidnapping, and they knew that cell phones had been used in connection with that crime. Accilien identified himself as an occupant of the bedroom in which the cell phones were found, and a letter addressed to Accilien was found on a table in that bedroom from another individual who was already incarcerated for the same crime. At the time of its seizure, the Officers believed that the cell phones belonged to Accilien.

The Officers had probable cause to seize the Cell Phone even if they believed or had reason to believe that it may have belonged to defendant Delva: Delva had just been handcuffed in the same room, drugs and a gun had been found in plain view near him, and Accilien had identified the items in the closet as belonging to Delva. The association between narcotics trafficking (for which Delva was initially arrested) and cell phones has been long established—cell phones can store information and images relating to the crime and participants in the crime (that is, who bought and sold the drugs).

In determining whether probable cause to seize the Cell Phone existed, the Court looks at the totality of the facts and circumstances as they existed at the scene. *See Barrios–Moriera,* 872 F.2d at 17–18. Those facts and circumstances leave no doubt that the Officers were acting within the law when they seized the Cell Phone. As the legal principles outlined above make clear, the Fourth Amendment of the Constitution only prohibits *unreasonable* searches and seizures; here, the seizure was perfectly reasonable.[4]

## IV. CONCLUSION

For the reasons set forth above, the instant motion to suppress is DENIED. The Clerk of the Court is directed to terminate the motion at ECF No. 75.

SO ORDERED.

---

4. On cross-examination, Deloren testified that, when the Officers first entered the Apartment, their intent was to arrest Accilien but not to conduct a search; after recovering the drugs and gun, the Officers then performed a general search. (Tr. at 76.) This testimony does not undermine the legality of the recovery of the Cell Phone—it was found in plain view during what was clearly a protective sweep.