USA v. Delva

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2015

(Argued:  May 20, 2016                                    Decided:  June 1, 2017)

Docket No. 15-683

_____

UNITED STATES OF AMERICA,

*Appellee*,

- v. -

DAVID DELVA, a/k/a Sealed Defendant 4,

*Defendant-Appellant*.

_____

Before:  KEARSE, WINTER, and JACOBS, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York, Katherine B. Forrest, *Judge*, convicting defendant of conspiracies to commit kidnapping and robbery, *see* 18 U.S.C. §§ 1201 and 1951; conspiracy to distribute narcotics, *see* 21 U.S.C. § 846; and substantive firearms offenses, *see* 18 U.S.C. §§ 924(c) and 922(g).  Defendant principally challenges the district court's ruling that law enforcement agents' seizure of his cellular telephone and of letters belonging to his uncle from the bedroom shared by defendant and his uncle, following the arrest of the uncle in the apartment in connection with the kidnapping and robbery, pursuant to an arrest warrant but without a search warrant, did not violate the Fourth Amendment

because those items were in plain view and were seized during a protective sweep of the apartment. Although the record shows that those items were in fact seized after the protective sweep had been completed and the agents had left and reentered the bedroom, the district court's findings that the items were in plain view in that room and were recognizable as evidence are not clearly erroneous; and we conclude that the agents' warrantless reentry into that room did not violate the Fourth Amendment because it was justified by the exigencies of the circumstances, given that the agents had found four adult males in the small apartment and had seen narcotics and a gun during the protective sweep, and that that bedroom was the only unoccupied room, other than the bathroom, in which to question, individually, the arrestee and the others in order to determine whom to arrest for possession of the narcotics and gun.

Affirmed.

Judge Jacobs dissents in a separate opinion.

JUSTINA GERACI, Assistant United States Attorney, New York, New York (Preet Bharara, United States Attorney for the Southern District of New York, Margaret Garnett, Assistant United States Attorney, New York, New York, on the brief), *for Appellee*.

STEVEN Y. YUROWITZ, New York, New York, *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant David Delva appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before Katherine B. Forrest, *Judge*, convicting him of conspiracy to commit robbery, in violation of 18 U.S.C. § 1951; conspiracy to commit kidnapping, in violation of *id.* § 1201; conspiracy to distribute narcotics, in violation of

21 U.S.C. § 846; possession of a firearm in furtherance of the drug trafficking offense, in violation of 18 U.S.C. § 924(c); and being a felon in possession of a firearm, in violation of *id*. § 922(g), and sentencing him principally to 360 months' imprisonment. On appeal, Delva contends principally that the district court erred in denying his motions for suppression of his cellphone and of letters addressed to his uncle, Gregory Accilien, seized by law enforcement agents without a search warrant, from the bedroom he shared with Accilien. The district court ruled that the seizure of those items did not violate the Fourth Amendment because they were in plain view and were seized during a protective sweep of the apartment following Accilien's arrest in the apartment pursuant to an arrest warrant in connection with the kidnapping and robbery. Although we agree with Delva that the record shows that the cellphone and letters were in fact seized after the protective sweep had been completed and the agents had left and reentered the bedroom, we conclude that the agents' warrantless reentry into that room did not violate the Fourth Amendment because it was justified by the exigencies of the circumstances, given that the agents had found four adult males in the small apartment and had seen narcotics and a gun during the protective sweep, and that that bedroom was the only unoccupied room, other than the bathroom, in which to question Accilien and the others individually in order to determine whom to arrest for possession of the narcotics and gun. As the district court's findings that the cellphone and letters were in plain view in that room and were recognizable as evidence are not clearly erroneous, we reject Delva's challenge to the denial of his suppression motions. Rejecting as well his additional evidentiary, procedural, and sentencing challenges, *see* Part II.B. below, we affirm the judgment.

3

The present prosecution of Delva had its origin in the kidnapping and robbery of a woman and a man in the Bronx, New York, which began on Labor Day weekend in 2012. Those crimes were investigated by a joint task force of Federal Bureau of Investigation ("FBI") agents and New York City Police Department ("NYPD") detectives and officers (collectively or in combination, the "Officers"). The evidence against Delva at trial (his codefendants had pleaded guilty) included drugs, a gun, and a cellphone, all belonging to him, and letters sent to Accilien by Accilien's brother (the "Accilien Letters"). Prior to trial, Delva initially moved to suppress only the drugs and gun, and a hearing was held; Delva thereafter sought to suppress the cellphone and, eventually, the letters.

The following description of the relevant events is taken from findings by the district court after the suppression-motion hearing, from credited evidence at that hearing which included testimony by the two law enforcement agents leading the investigation, and from evidence at Delva's ensuing trial which included testimony by those agents, Accilien, and the two victims of the kidnapping/robbery, as well as DNA evidence.

A. *The Kidnapping and Robbery*

Late on Sunday evening September 2, 2012, the female victim (or "FV"), who was the girlfriend of a drug dealer--the male victim (or "MV")--was accosted by codefendants Trevor Cole and Dominique Jean Philippe, brandishing guns, outside of her apartment in a building on Magenta Street. She was forced to enter the apartment with Cole and Jean Philippe, who proceeded to search unsuccessfully for drugs and money. FV was blindfolded and assaulted as Cole, Jean Philippe, and

others who joined them attempted to force her to telephone MV to get him to come to her apartment. FV stalled for about a day by calling a number she knew had been disconnected; but she eventually yielded and reached MV after being raped by three of the intruders, and urinated on by one of them.

Accilien, the brother of Jean Philippe (who was the author of the Accilien Letters), became involved in the early stages of the robbery when he telephoned Jean Philippe in an attempt to borrow money. At Jean Philippe's request, Accilien purchased duct tape and latex gloves and brought them to FV's apartment, where Jean Philippe and Cole informed him that they were in the middle of a robbery. When Accilien expressed unease and decided to leave, Jean Philippe told Accilien to bring their nephew Delva to FV's apartment to assist because Delva had had more experience than Accilien in committing robberies. Accilien returned with Delva. All of the robbers donned the latex gloves brought by Accilien and waited for MV to arrive.

Accilien and Delva left FV's apartment on September 3; Delva returned early on September 4. MV arrived thereafter and was held captive by Cole, Jean Philippe, and Delva, attempting to force him to disclose where he kept his cash. MV was bound, blindfolded (albeit ineffectively), stabbed, and repeatedly beaten. Accilien, who had remained at home, attempted to call Jean Philippe, Cole, and Delva to learn whether the robbery was proceeding as planned; when none of them answered their phones, Accilien went to FV's apartment to see whether everything was all right. MV ultimately capitulated and revealed the location of his cash. Cole and Jean Philippe went to that location while Accilien and Delva remained behind to guard FV and MV. During that time, MV managed to shift his blindfold sufficiently to see Accilien, who complained to Delva about the intruders' blindfolding proficiency. Accilien testified that Delva then readjusted MV's blindfold and hit MV several times with a mop handle.

5

The home invasion ended on September 4, after the robbers got, *inter alia*, more than $40,000 in cash, jewelry, and clothing, along with six pounds of marijuana and FV's car.

B. *The Early Investigation*

The investigation of the kidnapping and robbery was led by FBI Special Agent John Reynolds and NYPD Detective Ellis Deloren. Deloren arrived at the kidnapping/robbery scene and spoke with FV and MV before they were taken to a hospital, and he later interviewed them at the hospital. Deloren prepared photographic arrays, each of which included one suspect. FV identified Cole from one array; MV identified Jean Philippe from another. A sealed federal indictment was filed in late October 2012; Cole and Jean Philippe were arrested about a week later, and the indictment was unsealed as to them. Pictures of several items stolen from MV were found on Cole's cellphone.

MV also identified Accilien from a photo array. Accilien had a significant criminal history, which included a charge of assault on a police officer, and Deloren found in police files Accilien's last known address, a second-floor apartment on South Oak Drive in the Bronx. Deloren went to that address under the guise of looking for someone else who was supposedly wanted for a different crime. Accilien himself answered the street-level outer door, thereby allowing Deloren to infer that Accilien still lived at and/or frequented that address. An arrest warrant for Accilien was issued.

At about 6:00 a.m. on June 4, 2013, approximately 10 Officers, led by Deloren and Reynolds, went to the South Oak Drive address, knocked on the outer door, and identified themselves as police. Deloren, through the door's window, saw a man he thought was Accilien start to descend the stairs and promptly retreat; the Officers then breached the door and entered. In the second-floor

6

apartment they found Accilien, a woman and two children, and three other men--including Delva, who at that time was not a suspect in the kidnapping/robbery.

C. *The Denial of Delva's Suppression Motions*

The events following the Officers' entry into the building are recounted in the findings of the district court in denying Delva's initial suppression motion--which challenged the seizure only of the drugs and gun. *See United States v. Delva*, No. 12 Cr. 802, 2014 WL 465149 (S.D.N.Y. Jan. 27, 2014) ("*Delva I*"). The findings in that opinion--uncontested on appeal, except for a general challenge to credibility--include the following.

"The outer door entered onto a staircase that leveled off at a landing adjoining the kitchen. There was no interior door between the stairs and the kitchen." *Delva I*, 2014 WL 465149, at *2 (citations to the suppression hearing transcript ("H.Tr.") omitted). The apartment consisted of a kitchen, a bedroom/living room (the "living room"), a second bedroom (or "bedroom"), and a bathroom. "The apartment was about 500 square feet in total." *Id*.

As Reynolds was climbing the stairs, he could see Accilien at the top looking down at him. Both Reynolds and Deloren were stating: "Police, get down." Accilien complied and lay down on the floor in the kitchen. As Reynolds reached the top of the stairs, he saw two other men in the kitchen; Reynolds stepped further into the kitchen and instructed the two other men to get down. The kitchen was very small. Reynolds then noticed somebody in the second bedroom . . . . [whom he] later identified . . . as Delva.

*Id*. at *3 (citations to H.Tr. omitted). Both Reynolds and Deloren observed Delva inside the second bedroom walking toward the kitchen. *See id*.

Reynolds instructed Delva to get down on the ground. Delva did not immediately comply; Reynolds had to instruct him several times, and he did eventually comply. When Delva was lying on the ground, his head was in the bedroom near the doorway, with the rest of his body and legs stretching behind

7

him into the bedroom.  Reynolds then stepped either to the side of Delva or over Delva to make sure no one else was in the room.  Reynolds testified that he could not see the entire bedroom from the kitchen and needed to enter the bedroom to determine if anyone else was in that room and whether there could be any threats coming from that room.

When Reynolds entered the bedroom and looked to see if anyone else was present, he noticed a closet, the door of which was ajar.  He saw a clear, plastic bag on the floor of the closet that contained a white, powdery substance which he believed to be drugs.  The bag was on top of or right next to sneakers.  Reynolds testified that he did not touch anything or open anything before seeing the bag and the sneakers.

Immediately thereafter, Deloren entered the bedroom.  He [had] handcuffed Accilien very quickly and proceeded to the second bedroom.  He saw that Delva was on the ground, his body completely inside the bedroom.  Reynolds was focused on Delva and told Deloren about the bag in the closet.  Deloren stated that the closet door was open when he approached it.  He could see the floor of the closet and saw a clear, plastic bag with a white powdery substance in it; based on his experience he believed it to be cocaine.  Deloren bent down to pick the bag up and saw that just to the side of it, only a few inches away, was a sneaker with a firearm in it.  The gun was inserted barrel-first into the shoe.  Deloren then used the word "lunch" to notify Reynolds and others that there was a gun.  Deloren then quickly recovered the gun and made it safe by removing the magazine and emptying the chamber.

As he was handcuffing Delva, Reynolds heard Deloren almost immediately use the word "lunch," which Reynolds understood to be code for "gun." *Reynolds then moved Delva into the kitchen with the others.  Only two minutes had elapsed between the time the Officers entered the apartment and the apartment was secured with the men in handcuffs in the kitchen*.  Deloren testified that the men in the apartment were handcuffed to ensure officer safety.

*Reynolds and Deloren then brought Accilien into the bedroom and asked him to identify the other people in the apartment*; Accilien identified Delva as his nephew and the closet in the bedroom as belonging to Delva.

*Delva I*, 2014 WL 465149, at *3-*4 (footnote and citations to H.Tr. omitted) (emphases added).

The district court concluded that given the presence of other people in the apartment and the Officers' knowledge of Accilien's criminal history, "it would . . . have been imprudent and

unreasonable for the Officers to have entered the premises, seen the other men, and *not* conducted a protective sweep." *Delva I*, 2014 WL 465149, at \*6 (emphasis added). Further,

> when Reynolds saw the defendant in his bedroom, moving towards them, it was only prudent for Reynolds to ensure that the defendant was not going to create a safety issue. It was therefore perfectly appropriate for Reynolds to instruct the defendant to "get down." Reynolds and Deloren testified that, when the defendant was on the ground, he was positioned entirely inside the bedroom. There is no doubt that it was appropriate for Reynolds to step into the bedroom at that point in order to secure the defendant. Once Reynolds entered the bedroom, it was perfectly reasonable for him to look quickly around the room to determine if there were any other individuals in the room who might constitute a safety risk. *In doing so, his eyes noticed the open door to the closet and drugs in plain view. Deloren's entry to assist Reynolds led to recovery of the drugs Reynolds saw as well as the gun immediately next to it, which was also in plain view*.

> There is no evidence in the record that the drugs and gun were not in the position in which Deloren and Reynolds testified they were in--on the floor of the closet, with the door open, in plain view.

> Under these circumstances, the factual record is straightforward and supportive of a reasonable search and seizure of the [*drugs and gun*]. Under the circumstances described above, the protective sweep conducted by Reynolds and Deloren was reasonable. In addition, there is no factual basis to suggest that, once Reynolds and Deloren were in the bedroom, the [*drugs and gun*] w[ere] not in plain view. All of the evidence before the Court is that they were. Given the highly incriminating character of these items, their seizure was therefore perfectly lawful.

*Delva I*, 2014 WL 465149, at \*7 (emphases added).

The district court also noted that, "[o]n cross-examination," at the hearing, "Deloren testified that, when the Officers first went to the residence, their intent was to arrest Accilien but not conduct a search; after recovering the [drugs and gun], the Officers then performed a general search." *Id*. at \*7 n.5. However, the court concluded that that "testimony d[id] not undermine the legality of the recovery of the [drugs and gun]--these items were found in plain view during what was clearly a protective sweep." *Id*.

9

At the hearing on Delva's initial motion--to suppress the drugs and gun--Reynolds and/or Deloren testified that in the June 4, 2013 raid on Accilien's apartment, cellphones (one of which they later learned belonged to Delva) and the Accilien Letters had also been seized. Deloren testified that he saw the envelopes on the top of a small cabinet; he recognized that Accilien was the addressee and that the sender was Jean Philippe, whom Deloren had arrested in November 2012 in connection with the kidnapping and robbery of FV and MV.

During the hearing with respect to the drugs and gun, Delva expanded his suppression request to include his cellphone. The district court invited supplemental briefing on that request, and Delva's supplemental reply brief added a request to suppress the Accilien Letters. The government's position was that "law enforcement observed [those] items in plain view"--along with the drugs and the gun--"[d]uring a lawful protective sweep." (Government's Memorandum of Law in Opposition to Defendant David Delva's Motion To Suppress His Cellular Telephone, dated February 3, 2014, at 3-4.)

The district court, relying on evidence presented at the hearing following Delva's motion to suppress the drugs and gun, denied these supplemental motions to suppress Delva's cellphone and the Accilien Letters. *See United States v. Delva*, 13 F.Supp.3d 269 (S.D.N.Y. 2014) ("*Delva II*"). The court reiterated many of the findings it had made in *Delva I* with respect to the need for a protective sweep of the apartment and the plain-view observation of the drugs and gun, *see*, *e.g.*, *Delva II*, 13 F.Supp.3d at 272 ("The facts relevant to resolution of this motion were established at the evidentiary hearing on January 21, 2014. They are recited in this Court's January 27, 2014, 2014 WL 465149, decision on defendant Delva's first motion to suppress . . . ."), and it made additional findings focusing on the cellphone and the letters.

10

With respect to the cellphone, the court noted that the Officers had gone to the apartment to arrest Accilien because

> Accilien was alleged to have participated in a brutal robbery and kidnapping. At the time of the arrest, the officers who entered the Apartment knew that one or more cell phones had been used during the robbery and kidnapping.

*Delva II*, 13 F.Supp.3d at 271. After noting that the government argued that the Officers had seen "drugs, a gun, *and the Cell Phone* in plain view" "during the course of legitimate efforts *incidental to a protective sweep* that was itself incident to the arrest of Accilien," and that it was "undisputed that the Officers saw the drugs and gun *prior to* seeing the Cell Phone," *id*. (emphases added), the court stated that

> Delva's arguments on this motion are *the same as those on his prior motion* with respect to *the gun and drugs*: (1) the Officers[] had no need or right to enter the Apartment; (2) once in the Apartment, the Officers had no right to enter the bedroom which the defendant shared with others; (3) that the Cell Phone, which was recovered in the bedroom, was not in plain view; and (4) even if the Cell Phone was in plain view, it was not in and of itself contraband, evidence of a crime, or associated with evidence of a crime,

*Delva II*, 13 F.Supp.3d at 271-72 (emphases added). The district court rejected those arguments, noting that Delva

> proffered no evidence, nor elicited any evidence on cross-examination, that at the time it was seized, the Cell Phone was not in plain view in a bedroom that had been occupied the previous night by Accilien (the robbery and kidnapping suspect).

*Id*. at 271. After describing Deloren's discovery and unloading of Delva's gun, the court found as follows:

> *Reynolds then moved Delva into the kitchen with the others. Only two minutes had elapsed between the time the Officers entered the Apartment and the Apartment was secured with the men in handcuffs in the kitchen. Reynolds and Deloren then brought Accilien into the bedroom and asked him to identify the other people in the Apartment*; Accilien identified Delva as his nephew and

11

the closet in the bedroom as belonging to Delva. . . .

The Apartment was small. Two Officers stepped into the bedroom with Accilien to ask him who the other individuals were and to whom the items in the closet belonged. *While that was occurring, the Officers noticed and seized a letter and two cell phones.* The two cell phones were in plain view: one on a television stand and the other on the bed. At about the same time, Reynolds [*sic*] also saw an envelope in plain view with Accilien's name as the addressee. Reynolds [*sic*] saw that the sender of the envelope was one of the suspects in the same robbery and kidnapping; the letter had been sent from the sender's place of incarceration. While the cabinet on which the letter was located had a number of items on it, Special Agent Reynolds [*sic*] testified credibly that there was room for the letter to be in plain view on the cabinet with the address information visible.

*Delva II*, 13 F.Supp.3d at 273-74 (footnote and citations to H.Tr. omitted) (emphases added).

Having noted that "[p]atently incriminating evidence that is in plain view *during a proper security check* may be seized without a warrant," *id*. at 275 (internal quotation marks omitted) (emphasis ours), the district court denied Delva's supplemental suppression motions, concluding as follows:

*This Court previously determined that the Officers['] entry into both the Apartment and the bedroom in which the defendant had been living was lawful*. . . . The Court also previously determined that the *drugs and gun* which the Officers seized were in plain view. . . . No facts have been proffered disputing the fact that the cell phones were observed by Special Agent Reynolds in plain view on a table and on the bed in the bedroom in which Delva was arrested.

*There were multiple lawful reasons why the Officers had probable cause to believe that the Cell Phone was evidence of or contained evidence of criminal activity: the Officers were in the Apartment to arrest a man (Accilien) whom they were arresting for kidnapping, and they knew that cell phones had been used in connection with that crime.* Accilien identified himself as an occupant of the bedroom in which the cell phones were found, and a letter addressed to Accilien was found on a table in that bedroom from another individual who was already incarcerated for the same crime. At the time of its seizure, the Officers believed that the cell phones belonged to Accilien.

*The Officers had probable cause to seize the Cell Phone even if they believed or had reason to believe that it may have belonged to defendant Delva: Delva had just been handcuffed in the same room, drugs and a gun had been found in plain view near him, and Accilien had identified the items in the closet as belonging to Delva.* The association between narcotics trafficking (for which Delva was initially arrested) and cell phones has been long established--cell phones can store information and images relating to the crime and participants in the crime (that is, who bought and sold the drugs).

In determining whether probable cause to seize the Cell Phone existed, the Court looks at the totality of the facts and circumstances as they existed at the scene. . . . Those facts and circumstances leave no doubt that the Officers were acting within the law when they seized the Cell Phone. . . . The Fourth Amendment of the Constitution only prohibits *unreasonable* searches and seizures; here, the seizure was perfectly reasonable.FN4

> FN4 On cross-examination, Deloren testified that, when the Officers first entered the Apartment, their intent was to arrest Accilien but not to conduct a search; after recovering the drugs and gun, the Officers then performed a general search. This testimony does not undermine the legality of the recovery of *the Cell Phone--it was found in plain view during what was clearly a protective sweep*.

*Delva II*, 13 F.Supp.3d at 277 & n.4 (citations to H.Tr. omitted) (penultimate emphasis in original; other emphases added).

D. *The Trial*

As indicated above, at the time of his arrest on June 4, 2013, Delva was not a suspect in the kidnapping and robbery of FV and MV. Accilien, who began to cooperate with the authorities almost immediately after his arrest, did not reveal that Delva was involved in those crimes until mid-July. Thus, the drugs and gun found in Delva's closet on June 4 initially led to his arrest only on New York State drug and gun charges. After the Accilien Letters were reviewed by the Officers, however, Delva became a suspect: In one of the letters, received by Accilien several weeks after Jean Philippe was arrested, Jean Philippe wrote that he had not cooperated with the authorities, and he urged

13

Accilien and Delva to "stand[] tall" and not inform on Jean Philippe. In August 2013, Delva was rearrested on federal charges, alleging not only narcotics and firearm offenses, but also substantive and conspiracy kidnapping and robbery crimes against FV and MV.

At Delva's trial (Cole and Jean Philippe by then had pleaded guilty to charges relating to the kidnapping and robbery and had been sentenced to prison terms of life plus seven years) the government's evidence included testimony by FV and MV and law enforcement officials; Accilien testified about his and Delva's involvement in the kidnapping and robbery and about Delva's narcotics distribution business. The government also presented evidence that one of the latex gloves recovered from FV's apartment contained Delva's DNA.

The jury found Delva guilty of conspiring to commit kidnapping and robbery, in violation of 18 U.S.C. §§ 1201 and 1951; conspiring to distribute narcotics, *see* 21 U.S.C. § 846; and substantive firearms offenses, *see* 18 U.S.C. §§ 924(c) and § 922(g). It found Delva not guilty of the substantive offenses of kidnapping, robbery, and use of a gun in furtherance of kidnapping and robbery. He was sentenced principally to 360 months' imprisonment, *see* Part II.B.3. below.

## II. DISCUSSION

On appeal, Delva contends principally that the district court erred in denying his motions to suppress his cellphone and the Accilien Letters, arguing chiefly that the court erred in finding that the seizure of those items occurred during the Officers' protective sweep of the apartment. He also contends, *inter alia*, that the district court abused its discretion (a) in allowing FV to testify that she was raped during the home invasion, because she could not identify Delva as one of those

14

who raped her, (b) in excusing a juror before the end of trial, and (c) in imposing a severe sentence based in part on conduct of which he was acquitted; we find no merit in these contentions for the reasons stated in Part II.B. below. For the reasons discussed in Part II.A. below, we see no error in the district court's findings that the cellphone and letters--recognizable as likely evidence (cellphones having been used in the kidnapping/robbery, and the letters being post-kidnapping/robbery communications between two of the charged coconspirators)--were in plain view in the second bedroom; but the court erred in finding that the cellphone and letters were seen and seized during the Officers' protective sweep. The record and the court's findings reveal that the apartment was secured before the Officers reentered the bedroom, and that the cellphone and letters were seen only after their reentry. Nonetheless, we affirm the denial of the motions to suppress those items because we conclude that the agents' warrantless reentry into that bedroom was justified by the exigencies of the circumstances, and thus did not violate the Fourth Amendment, given that the agents had found four adult males in the small apartment and had seen narcotics and a gun during the protective sweep, and that that bedroom was the only unoccupied room, other than the bathroom, in which to question Accilien and the others individually in order to determine whom to arrest for possession of the narcotics and gun.

A. *Fourth Amendment Issues*

The Fourth Amendment to the Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "It is axiomatic that the physical entry of the home is the chief evil against which the wording of

15

the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (internal quotation marks omitted). Thus, generally, as "a basic principle of Fourth Amendment law," entries into a home without a warrant, or "searches and seizures inside a home without a warrant[,] are presumptively unreasonable," *id*. at 749 (internal quotation marks omitted); *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotation marks omitted). However, the Court

> ha[s] also recognized that this presumption may be overcome in some circumstances because "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" . . . . Accordingly, the warrant requirement is subject to certain reasonable exceptions.

*Id*. at 459 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("*Brigham City*")). The "'few[,] specifically established[,] and well-delineated exceptions,'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)), include security-based limited searches in conjunction with an in-home arrest pursuant to an arrest warrant (*see* Part II.A.1. below), entries into a home in exigent circumstances (*see* Part II.A.4. below), and seizures by the officers of "any evidence that is in plain view during the course of their legitimate emergency activities," *Mincey*, 437 U.S. at 393 (*see* Part II.A.2. below).

As a procedural matter, a defendant seeking suppression of evidence found without a search warrant must show that he had a reasonable expectation of privacy in the place or object searched. *See*, *e.g.*, *California v. Greenwood*, 486 U.S. 35, 39 (1988); *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978). If such a privacy interest is established, the government has the burden of showing that the search was lawful because it fell within one of the exceptions to the warrant requirement. *See*, *e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *Welsh*, 466 U.S. at 750 (exigent circumstances); *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999) (plain view).

16

"In reviewing the district court's ruling on a motion to suppress, we review its conclusions of law *de novo* and its factual findings for clear error." *United States v. Medunjanin*, 752 F.3d 576, 584 (2d Cir.), *cert. denied*, 135 S. Ct. 301 (2014); *see generally Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers"). In reviewing the denial of such a motion, we "view[] the evidence in the light most favorable to the government," *United States v. Ivezaj*, 568 F.3d 88, 96 (2d Cir. 2009), *cert. denied*, 559 U.S. 998 (2010), and we give "special deference to findings that are based on determinations of witness credibility," *United States v. Lucky*, 569 F.3d 101, 106 (2d Cir. 2009), *cert. denied*, 559 U.S. 1031 (2010). Whether the Fourth Amendment was violated, given the nonerroneous findings of historical fact, is a question of law, which we review *de novo*. *See id*. at 105-06.

### 1. *Protective Sweeps*

Law enforcement authorities generally do not need a search warrant to enter a suspect's home when they have an arrest warrant for the suspect, as "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). Further, "[i]t is well settled that a search incident to a lawful arrest is a traditional exception to the [search] warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224 (1973). Thus, "a search may be made of the person of the arrestee by virtue of the lawful arrest. [In addition,] a search may be made of the area within the control of the arrestee." *Id*. (emphasis

17

omitted).

> When a person is arrested inside a residence, the officers may permissibly,

> as an incident to the arrest . . . , as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.

*Maryland v. Buie*, 494 U.S. 325, 334 (1990). Such a security check or "protective sweep" is subject to limitations. The *Buie* Court

> emphasize[d] that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.FN3  The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

>> FN3  . . . .  A protective sweep is without question a "search" . . . ; [it is] permissible on less than probable cause only because [it is] limited to that which is necessary to protect the safety of officers and others.

*Id*. at 335-36 & n.3.

#### 2. *The Plain View Doctrine*

The "plain view" doctrine is a recognized exception to the Fourth Amendment requirement of a warrant for seizures. *See*, *e.g.*, *Horton v. California*, 496 U.S. 128, 134 (1990) (objects in plain view are not found through a privacy-invading search; thus, "[i]f 'plain view' justifies an exception from an otherwise applicable warrant requirement, . . . it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches"). Under the plain-view exception, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to

18

the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *see Horton*, 496 U.S. at 136-37; *Illinois v. Andreas*, 463 U.S. 765, 771 (1983). "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton*, 496 U.S. at 133. However, the "plain view" doctrine cannot be invoked to justify an extended search; "the doctrine is associated only with the seizure of items" that are--as the label indicates--in plain view. *Ruggiero v. Krzeminski*, 928 F.2d 558, 562 (2d Cir. 1991).

Thus, under the "security check" exception, when law enforcement officers have lawfully entered premises in connection with an arrest, and in the course of making a permissible quick and limited protective sweep of the premises they see an object whose incriminating character is immediately apparent, "and if the officers have a lawful right of access to the object, they may seize it without a warrant," *Dickerson*, 508 U.S. at 375; *see Horton*, 496 U.S. at 136-37. The plain-view doctrine may allow discovered items to be admitted in evidence even where "the discovery of the evidence was not inadvertent." *Id.* at 130 ("even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition").

### 3. *The District Court's Decision*

In support of his contention that the district court erred in denying his supplemental motions to suppress his cellphone and the Accilien Letters, Delva argues principally that the court erred in ruling that those items were seen and seized during the Officers' protective sweep of the apartment. He also contends that those items were not in fact in plain view and that the testimonies of Reynolds and Deloren were not credible. Leaving aside the question of whether Delva even has standing to challenge the seizure of the Accilien Letters, which were not authored by or addressed to

19

Delva--an issue not raised by the government in the district court--we find no basis for reversal.

The challenges to the court's credibility assessments and to its findings as to where the cellphone and letters were found do not require extended discussion. First, we see no basis in the present record for overturning the credibility determinations by the district judge, who had the opportunity to view and hear the witnesses. Second, for the proposition that the letters were not in plain view, Delva cites testimony by Accilien at trial that the letters were in the closet. Accilien, however, was not called as a witness at the suppression hearing. At that hearing, the only witness as to the location of the letters was Deloren, who testified that he saw them on the top of a low cabinet. Apart from the district court's misattributing to Reynolds the Deloren testimony as to the observation of the letters, its finding that the Accilien Letters were in plain view is not clearly erroneous.

Delva's contention that the district court erred in ruling that his cellphone and the Accilien Letters were seen and seized during the Officers' protective sweep of the apartment gives us greater pause. While most of the court's findings, further discussed in Part II.A.4. below, are amply supported by the record, we see three difficulties with the court's conclusion that Delva's motions to suppress those items should be denied because they were seen during the protective sweep: (1) the court misunderstood the basis for Delva's principal argument for suppression of the cellphone and the letters; (2) it assumed that its prior findings with respect to the drugs and the gun were fully applicable to the cellphone and the letters; and (3) it failed to take into account that the protective sweep had been completed before the Officers reentered the bedroom and saw the cellphone and letters.

First, the court stated that Delva's arguments in support of his request to suppress his cellphone and the Accilien Letters were "the same as those on his prior motion with respect to the gun and drugs," *i.e.*, essentially that "the Officers had no right to enter" the apartment or the bedroom, and

20

that the cellphone "was not in plain view" and was not contraband or evidence of a crime. *Delva II*, 13 F.Supp.3d at 271-72. However, Delva argued that the hearing testimony established that by the time the cellphone and letters were found, the protective sweep had in fact been completed:

> [T]he [government's] Opposition Memorandum claims the cell phones and envelope were observed in the bedroom, "in plain view," during the protective sweep. However, this allegation is not accurate and belied by the record. *The Hearing established, during the protective sweep, only the gun and crack cocaine were observed and seized by the agents*. This observation, and seizure, occurred while Mr. Delva was handcuffed (while lying on the floor of his bedroom). After the gun and cocaine were recovered from the closet, the agents lifted Mr. Delva (who was handcuffed) off the ground and walked him, out of the bedroom, into the kitchen. (Hearing p. 29-30, 45). In addition, at that time, one of the agents further checked the bedroom closet and looked under the bed to make sure no one else was in the bedroom. (Hearing p. 50).
>
> After Mr. Delva, and the agents, were out of the, now vacant and secure, bedroom, the agents asked Mr. Delva for his consent to re-enter and search his bedroom. (Hearing p. 32). Mr. Delva expressly refused to give consent to the agents. *Id*. Nonetheless, thereafter, agents re-entered the bedroom with Accilien. Supposedly, *while in the room*, Accilien gave consent to search the bedroom. *During the course of this general search*, the cell phones and envelope were allegedly observed to be in "plain view." (Hearing p. 87-90). In addition, other items such as a box of ammunition, was [*sic*] recovered from a closed drawer. (Hearing p. 87-88).
>
> However, *after the protective sweep was completed, and after the agents had left the bedroom with Mr. Delva, there was no lawful basis to re-enter the bedroom. The bedroom was clear and secure pursuant to the prior protective sweep*. In addition, *Mr. Delva, Accilien and all of the other occupants had been secured*. (Hearing p. 72-73). Moreover, Mr. Delva expressly refused to give the agents consent to re-enter and search the bedroom. *Under these circumstances, the re-entry into the bedroom, with Accilien, was not a part of a protective sweep. It was a warrantless re-entry, into Mr. Delva's bedroom, in violation of the Fourth Amendment*. As such, all items seized (including the cell phone, letters and anything else) must be suppressed.

(Delva Reply Memorandum of Law in Further Support of Defendant's Motion To Suppress Cellular Telephone and Other Property at 3-5 (emphases added).) The court did not acknowledge this

21

argument.

Second, the district court noted that it had "previously [in *Delva I*] determined that the Officers['] entry into . . . the bedroom in which [Delva] had been living was lawful," *Delva II*, 13 F.Supp.3d at 277. But that prior determination was made in connection with Delva's initial motion, which had sought suppression of only the drugs and the gun, *see Delva I*, 2014 WL 465149, at *1 ("Delva moved to suppress evidence of drugs and a gun (the 'Evidence')"); *id.* at *7 (concluding that the record showed a "reasonable search and seizure of the Evidence" because "the protective sweep conducted by Reynolds and Deloren was reasonable"). The drugs and gun were seen during the Officers' first visit to the bedroom while they were conducting the protective sweep. There was no testimony that cellphones and letters were seen before Deloren and Reynolds completed their protective sweep of the bedroom and took Delva into the kitchen. Thus, the district court's prior ruling with respect to the drugs and the gun could not be controlling with respect to the cellphone and letters.

Finally, although the district court noted that "the Officers saw the drugs and gun *prior to* seeing the Cell Phone," *Delva II*, 13 F.Supp.3d at 271 (emphasis added), it failed to recognize that the second sighting did not occur during the protective sweep, and occurred only after that sweep had been completed and the Officers had vacated the bedroom and then returned. The court found, based on the testimonies of Reynolds and Deloren, that after the Officers entered the apartment, Accilien and the two men other than Delva had promptly complied with the Officers' orders to lie down on the floor and had been handcuffed in the kitchen; that Deloren, after quickly handcuffing Accilien, went into the bedroom where Reynolds was handcuffing Delva; that after Deloren retrieved and unloaded the gun seen in the bedroom closet, Reynolds moved Delva into the kitchen with Accilien and the

22

other two handcuffed men; and that the protective sweep had been completed in no more than two minutes. *See Delva II*, 13 F.Supp.3d at 271-73; *Delva I*, 2014 WL 465149, at *3-*4. The court found that after "Reynolds . . . moved Delva into the kitchen with the others . . . . Reynolds and Deloren *then* brought Accilien into the bedroom" to question him, *Delva II*, 13 F.Supp.3d at 273 (emphasis added); *Delva I*, 2014 WL 465149, at *4 (emphasis added), and saw the cellphone and letters "in plain view," *Delva II*, 13 F.Supp.3d at 274.

We conclude that the district court's bottom-line finding that Delva's cellphone and the Accilien Letters were found "during" the protective sweep, *e.g.*, *id*. at 277 n.4 ("the Cell Phone . . . was found in plain view during what was clearly a protective sweep"), is clearly erroneous. The above detailed factual findings make it plain that the Officers returned to the bedroom with Accilien only after the protective sweep had been completed, and that they saw the cellphone and letters only after their return and not during their protective sweep. Thus, the discovery of the cellphone and the letters was not covered by the protective-sweep exception to the Fourth Amendment's warrant requirement.

4. *The Exigent Circumstances Exception*

The conclusion that the plain-view discovery of Delva's cellphone and the Accilien Letters did not occur during the Officers' protective sweep of the apartment, however, does not end our inquiry, for "[w]e are free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied," *Headley v. Tilghman*, 53 F.3d 472, 476 (2d Cir.), *cert. denied*, 516 U.S. 877 (1995). Based on other findings that are not clearly erroneous, we conclude that despite the fact that Delva's cellphone and the Accilien Letters were seen in a room

23

reentered by the Officers after the conclusion of the protective sweep, the Officers' reentry into that room did not violate the Fourth Amendment.

As "reasonableness is always the touchstone of Fourth Amendment analysis," *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2186 (2016); *see*, *e.g.*, *Brigham City*, 547 U.S. at 403; *United States v. Place*, 462 U.S. 696, 703 (1983) ("[w]e must balance the nature and quality of the intrusion on . . . Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion"), "[i]t is well-settled . . . that the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement officers to act without delay," *United States v. Moreno*, 701 F.3d 64, 72-73 (2d Cir. 2012) ("*Moreno*") (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 2797 (2013); *see*, *e.g.*, *King*, 563 U.S. at 460 ("One well-recognized exception" to the warrant requirement applies when "'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" (quoting *Mincey*, 437 U.S. at 394) (other internal quotation marks omitted)); *United States v. Andino*, 768 F.3d 94, 98 (2d Cir. 2014) ("*Andino*"); *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc) ("*MacDonald*"), *cert. denied*, 498 U.S. 1119 (1991).

The various situations in which exigent circumstances may justify a warrantless search "do not necessarily involve equivalent dangers," but in each the agents' action "is potentially reasonable because 'there is compelling need for official action and no time to secure a warrant.'" *Missouri v. McNeely*, 133 S. Ct. 1552, 1559 (2013) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)); *but see King*, 563 U.S. at 467 ("[L]aw enforcement officers are under no constitutional duty to call a halt to criminal investigation the moment they have the minimum evidence to establish

24

probable cause. . . . Faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause [would] impose[] a duty that is nowhere to be found in the Constitution." (internal quotation marks omitted)). "[T]he general exigency exception, which asks whether an emergency existed that justified a warrantless search [or entry], naturally calls for a case-specific inquiry" that looks to the "totality of the circumstances." *McNeely*, 133 S. Ct. at 1559 & n.3; *see*, *e.g.*, *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (the reasonableness inquiry is "fact-specific"); *Birchfield*, 136 S. Ct. at 2180 (the "exigent circumstances" exception "always requires case-by-case determinations"). And in any determination of whether there were exigent circumstances sufficient to justify conduct for which the Fourth Amendment normally requires a warrant, the fundamental question is whether it was objectively reasonable for the law enforcement officers to believe there was an urgent need for that warrantless conduct. *See*, *e.g.*, *Riley v. California*, 134 S. Ct. 2473, 2487, 2494 (2014); *King*, 563 U.S. at 460-62; *Mincey*, 437 U.S. at 394. "'[T]he ultimate determination of whether a search was objectively reasonable in light of exigent circumstances is a question of law reviewed *de novo*.'" *Andino*, 768 F.3d at 98 (quoting *Moreno*, 701 F.3d at 72).

Among the most common exigencies found to validate entry into a home with probable cause but without a warrant are the need to prevent the escape of a felon, *see*, *e.g.*, *United States v. Santana*, 427 U.S. 38, 42-43 (1976) (officers may enter a home without a warrant when they are in hot pursuit of a fleeing suspect), and the need to prevent the destruction of evidence, *see*, *e.g.*, *King*, 563 U.S. at 462; *Brigham City*, 547 U.S. at 403 (the need "to prevent the imminent destruction of evidence" has long been recognized as a sufficient justification for a warrantless search). "But a warrantless [entry or] search must be strictly circumscribed by the exigencies which justify its

initiation . . . ." *Mincey*, 437 U.S. at 393 (internal quotation marks omitted). For example, in *Tyler*, the Supreme Court ruled that entry into a burning building "to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze," 436 U.S. at 511, and during that time they "may seize evidence of arson that is in plain view," *id*. at 509.

> *Fire officials are charged not only with extinguishing fires, but with finding their causes*. Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace. *Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction*. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. *For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished*.

*Id*. at 510 (footnote omitted) (emphases added). However, "[t]hereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches." *Id*. at 511. For similar reasons, our Court, in *United States v. Oguns*, 921 F.2d 442 (2d Cir. 1990), in dealing with a protective sweep, has noted that "[o]nce police eliminate the dangers that justify a security sweep--safety of police, destruction of evidence, escape of criminals--they must, *barring other exigencies*, leave the residence," *id*. at 447 (emphasis added). Other exigencies, for example, may include the need to reenter or remain in the premises for the purpose of having the arrestee appropriately clothed, *see*, *e.g.*, *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977); *United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir.), *cert. denied*, 531 U.S. 1025 (2000), or the need, postarrest, to move to a different room in order to identify and question a third party who has sought to interfere with the arrest, *see*, *e.g.*, *United States v. Ocean*, 564 F. App'x 765, 771 (6th Cir. 2014) ("[t]he officers' removal of [the third party] from the hallway into the

26

apartment bedroom was reasonable under the circumstances"); *see also id.* at 772 (concurring opinion of White, *J.* ("The facts support a finding of exigency here.")).

Our Court's nonexhaustive test for assessing whether the circumstances were sufficiently exigent to excuse the warrantless conduct, *see*, *e.g.*, *MacDonald*, 916 F.2d at 769-70--which "is similar to the one . . . recognize[d]" by the Supreme Court, *King*, 563 U.S. at 463--considers, *inter alia*,

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry,

*MacDonald*, 916 F.2d at 769-70 (internal quotation marks omitted) ("*MacDonald* factors"); *see*, *e.g.*, *Andino*, 768 F.3d at 98 & n.3; *Moreno*, 701 F.3d at 73. These

> factors are intended not as an exhaustive canon, but as an illustrative sampling of the kinds of facts to be taken into account. . . . Sometimes the presence of a solitary factor suffices, *see*, *e.g.*, *United States v. Gallo-Roman*, 816 F.2d 76, 79-80 (2d Cir.1987) (destruction of evidence), alternatively, a combination of several, *see*, *e.g.*, *United States v. Callabrass*, 607 F.2d 559, 563-64 (2d Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980) (destruction of evidence and danger to public).

*MacDonald*, 916 F.2d at 770.

Adapting this test to the present case--since we are concerned with (a) the Officers' remaining in the apartment beyond the time when the arrest of Accilien had been accomplished, and (b) a reentry, rather than an initial entry (the Officers having lawfully entered the apartment pursuant to the arrest warrant), into a room in which there were no longer any potentially threatening persons (the protective sweep having been lawfully completed and all adult males having been secured in the kitchen)--we conclude that most of the *MacDonald* factors, along with other important considerations,

27

based on substantiated facts found by the district court, lead to the conclusion that exigent circumstances justified the Officers' warrantless return to the second bedroom.

We begin with fact that the Officers, having lawfully entered the apartment with a warrant to arrest Accilien, fortuitously saw drugs and a gun, with a chambered round, in plain view during their lawful protective sweep of the bedroom. Drug trafficking is plainly a serious crime, one often accompanied by violence, *see*, *e.g.*, *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir.) ("guns are tools of the narcotics trade"), *cert. denied*, 544 U.S. 990 (2004). There was a clear need for the Officers to remain in the apartment long enough to ensure, *inter alia*, that persons engaged in drug trafficking were not released.

There were four adult males in the small apartment when the Officers arrived around 6:00 a.m. The living room, equipped with a mattress on the floor or a pull-out couch, was occupied by the woman and children. (*See* H.Tr. 72.) The bedroom in which the drugs and gun were found contained not only a bed but an inflatable mattress. (*See id*. at 48.) There was thus probable cause to believe that the drugs and gun were owned by one of the four men; whoever owned those items was subject to immediate arrest; all four men were suspects.

Although at the time of the Officers' reentry into the by-then-empty bedroom there was no reason to believe that any of the suspects were armed, it was objectively reasonable to fear that if the owner of the drugs and gun were not identified and were allowed to depart he would likely attempt to escape apprehension or further detection. In the interest of protecting the public, it was the responsibility of law enforcement not only to seize the drugs and the gun, but also to determine who owned or possessed them and to place that person under arrest.

No doubt the Officers could have sought (and obtained) a search warrant for the

28

apartment; but a search would likely not tell the Officers who owned the drugs and gun. The purpose of their reentry into the bedroom was not to search for additional items that might be found there--a task that could have been performed without bringing Accilien or any of the other suspects into the room--but rather to seek information as to who owned the drugs and the gun. *See Delva I*, 2014 WL 465149, at \*4 (the Officers "brought Accilien into the bedroom and asked him to identify the other people in the apartment"); *Delva II*, 13 F.Supp.3d at 274 (the Officers "stepped into the bedroom with Accilien to ask him who the other individuals were and to whom the items in the closet belonged").

Thus, the Officers reasonably sought to determine expeditiously whom, if anyone other than Accilien, they should arrest. (*See also* H.Tr. 84 (the Officers spent some 15-20 minutes "running names of people that were in the apartment"--thereby "discover[ing] an outstanding warrant for David Delva").)

Perhaps, instead of questioning Accilien as to the identities of the other three men and as to who owned the drugs and gun, the Officers could have taken all four men to the police station for questioning. But mere presence at a place in which there are illegal drugs is not a crime. Certainly it was less intrusive for the Officers to attempt to find out immediately whom, other than Accilien, to arrest and whom not to. Further, given the possibility that the drugs and gun did not belong to Accilien, it was reasonable for the Officers to attempt to have him name the owner outside of the presence of the other men, in order to facilitate Accilien's candor and reduce the possibility of intimidation by the owner. But in order to interview Accilien beyond the hearing of the other three men, the Officers were forced to go somewhere other than the kitchen.

The apartment was very small, about 500 square feet in total, consisting of the living room occupied by the woman and children, the kitchen, the bathroom, and the bedroom. There was

29

no door between the kitchen entrance to the apartment and the landing at the top of the stairs; there was no anteroom, or any hallway, in which the Officers could question Accilien privately. In these circumstances, given the need to determine which of the other men in the apartment--if any of them-- should be arrested, the Officers' decision to return to the bedroom, the only unoccupied room other than the bathroom, in order simply to question Accilien, or to question any of the other men individually, in order to determine whom to arrest for possession of the drugs and the gun, was objectively reasonable. After Accilien identified Delva and stated that those items belonged to Delva, the Officers arrested Delva.

In sum, the law enforcement interest in promptly questioning Accilien in private while the other three men were still being detained was strong, and the return to the empty bedroom for that purpose was a reasonable and minimal intrusion into the residents' privacy. Although the government did not argue exigent circumstances in the district court, we conclude that the facts found by the district court, and substantiated by the evidence, provide ample basis for application of the exigent circumstances exception to the Officers' reentry into the bedroom. In these circumstances, as we see no error in the district court's finding that the cellphone and letters were observed in that room in plain view, we conclude that the record required the denial of Delva's motions to suppress the cellphone and the letters.

B. *Other Contentions*

Delva also raises challenges to certain of the court's evidentiary, procedural, and sentencing decisions.

30

1. *FV's Testimony that She Was Raped*

Delva contends that the district court abused its discretion in permitting FV to testify that during the kidnapping/robbery she was raped. He contends that even if FV was raped, the government failed to prove that he was a participant or that the rape was reasonably foreseeable to him, and therefore her testimony about the rape was irrelevant and highly prejudicial. The district court denied Delva's *in limine* motion to exclude that evidence, noting that Delva was charged not only with the substantive offenses of kidnapping and robbery but also with conspiring to commit those offenses; the court concluded that the rape evidence was relevant and, given the circumstances of the crimes, was not unfairly prejudicial. *See United States v. Delva*, No. 12 Cr. 802, 2014 WL 4460360, at *6-*7 (S.D.N.Y. Sept. 10, 2014) ("*Delva III*"). "We review a district court's evidentiary rulings under a deferential abuse of discretion standard, and we will disturb an evidentiary ruling only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015) (internal quotation marks omitted).

FV testified that for about a day, she managed to resist the intruders' orders to summon MV to her apartment and that she gave in only after three of them, in close succession, raped her. Her testimony was directly relevant to the manner in which the robbery succeeded: "[T]hreatened or actual use of force or violence" was an element in the crimes. *Delva III*, 2014 WL 4460360, at *6.

Further, although Delva contends that there was no evidence to show that he could have anticipated that his codefendants would commit rape, Accilien testified that Jean Philippe instructed Accilien to bring Delva to FV's apartment specifically because Delva was experienced in committing robberies--evidence that the court found had a tendency to show a "relationship of trust between the defendant and his coconspirators," *id*. at *8. We cannot conclude that there was error,

31

much less "manifest" error, in the district court's evidentiary ruling.

We also reject Delva's related contention that his attorney's decision not to cross-examine FV and attempt to shake her testimony that she had in fact been raped, violated his Sixth Amendment right to effective assistance of counsel. In order to prevail on such a claim, a defendant must show, *inter alia*, "that counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984). An attorney's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id*. at 690, and counsel's obligation to consult with his client with regard to "important decisions" "does not require counsel to obtain the defendant's consent to every tactical decision," *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (internal quotation marks omitted).

Delva did not and does not claim that his attorney had not conducted a sufficient investigation. His disagreement with counsel, aired to the district court at the start of trial, was an objection as to trial strategy. Delva stated, "Really, basically the whole thing was just about disagreements about his method and the fact that he was going one way that I'd agreed with before. Then at the end, that he changed at the last moment." (Trial Transcript ("T.Tr.") 49.) Counsel stated that after extended consideration, he had made a "strategic decision." (*Id*.) And in his summation to the jury, he argued that as FV was blindfolded and unable to say which three men had raped her, and that given that at one point only Cole, Jean Philippe, and Accilien were there, it was reasonable to infer that those were the three men, not including Delva, who raped her. (*See id*. at 1255-56.)

Given the evidence as to the manner in which the kidnapping/robbery was committed, we conclude that counsel's strategic decision to make that argument, rather than to attempt to shake FV's testimony that she had in fact been raped, did not fall below an objectively acceptable level of

32

competence.

2. *The Replacement of Juror No. 7*

Delva also complains of the district court's removal of one of the jurors late in the trial. We conclude that the circumstances, which we set out below, warranted the juror's removal.

After the jury retired to deliberate, the district court pointed out that during Delva's closing argument, Juror No. 7 had acted in an "unusual" manner by frequently nodding her head. (T.Tr. 1363.) That night, the government ran a background check on the juror and reported that she appeared to have a criminal record, including a felony conviction for possession of crack cocaine. The court's voir dire had included the question "Have any of you been charged with a crime or been the subject of any government investigation or accusation?" and the juror had not responded affirmatively. Over Delva's objection, the court decided to question Juror No. 7 to determine whether she in fact had a criminal record and, if so, why she had failed to disclose that fact on her juror questionnaire or during voir dire. The court conducted two such rounds of questioning.

In the first, when asked at the outset how many times she had been arrested, Juror No. 7 responded "Once." (T.Tr. 1383.) Upon further questioning, she again stated that she had been arrested just once (*see id.*); but then she admitted that she had been imprisoned for a felony conviction and that she had two additional arrests (*see id*. at 1384-85). She stated that she did not disclose the felony conviction on her juror questionnaire or during voir dire because her civil rights had been restored and that she did not disclose the other two arrests because the cases were old. The court briefly sent the juror out of the courtroom; the government argued that the juror was still being untruthful because her criminal record revealed that she had actually been arrested 10 times from 1986

33

through 2010.

In the second round of questioning, the court proceeded, date by date, to ask Juror No. 7 whether she had been arrested. She admitted being arrested on three dates (*see id*. at 1391-93), including once for her narcotics "[d]ealing" felony (*id*. at 1393). As to each of the other seven dates, she denied, or stated that she had no recollection of, being arrested.

The court found that "[Juror No. 7] was being decidedly untruthful" (*id*. at 1395), and it concluded that there was a strong possibility of bias:

> Well, we've gone from one to three arrests, and we're getting I think varying and shifting stories about the arrests each time. I don't think we have a clear answer on whether or not she recalls or doesn't recall earlier arrests. . . . I think that she's embarrassed about some of the convictions, I think that she's not wanted to talk about them because she finds them embarrassing, but I believe that they occurred and I think, based upon how she was responding when I was going through the other dates, I would bet that if we fingerprinted her as [counsel] suggests, that we would find that the others occurred as well. I certainly believe that the three are sufficient. We've gotten several different answers now on these arrests, and that concerns me.
>
> . . . .
>
> The court is going to dismiss juror no. 7, based upon juror misconduct, based upon the court's determination that there are a number of instances where the juror has been untruthful with the court, starting potentially with the questionnaire, though there's a possible explanation for that, but certainly in the voir dire process and then most recently during the questioning this morning before the court.

(T.Tr. 1394-97.) Juror No. 7 was replaced with an alternate and the reconstituted jury was instructed to begin deliberations anew.

The trial judge is authorized to remove a juror for "good cause" after deliberations have begun and to replace that juror with an alternate, so long as the reconstituted jury is instructed to begin deliberations anew. *See*, *e.g.*, *United States v. Yousef*, 327 F.3d 56, 160 n.72 (2d Cir.), *cert. denied*,

34

540 U.S. 933 (2003); *see also* Fed. R. Crim. P. 24(c)(3) and Advisory Committee Note (1999).

"'Good cause' encompasses a variety of problems that may arise with respect to the jury, including . . .

misconduct." *United States v. Vartanian*, 476 F.3d 1095, 1098 (9th Cir. 2007). Misconduct includes

lying on voir dire. *See*, *e.g.*, *United States v. Parse*, 789 F.3d 83, 111 (2d Cir. 2015).

> *Voir dire* examination serves to protect [the right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. *The necessity of truthful answers by prospective jurors* if this process is to serve its purpose *is obvious*.

*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (emphases added). The

trial judge's decision to replace a juror for good cause is reviewable for abuse of discretion. *See*, *e.g.*,

*United States v. Spruill*, 808 F.3d 585, 592 (2d Cir. 2015), *cert. denied*, 137 S. Ct. 407 (2016); *United*

*States v. Reese*, 33 F.3d 166, 173 (2d Cir. 1994), *cert. denied*, 513 U.S. 1092 (1995).

We see no abuse of discretion here in the procedures adopted by the district court or

in its ultimate decision to excuse Juror No. 7. Whether or not Juror No. 7's civil rights had been

restored, she had no right to fail to respond truthfully to the juror questionnaire or the court's questions

on voir dire. Her lack of candor about her criminal record at the pretrial stage, which the court found

continued in response to the court's direct inquiry, gave the court ample cause to dismiss Juror No. 7.


3. *Sentencing*

The presentence report ("PSR") prepared on Delva calculated that his base offense

level under the advisory Sentencing Guidelines ("Guidelines") was 32, *see* Guidelines § 2A4.1(a); that

level was increased by six steps because a ransom demand was made, *see id*. § 2A4.1(b)(1); plus two

steps because the victims sustained serious bodily injury, *see id.* § 2A4.1(b)(2)(B); plus six steps because a victim was sexually exploited during the commission of the kidnapping/robbery, *see id.* § 2A4.1(b)(5); plus one step for the grouping of his offenses, *see id.* § 3D1.4, bringing the total offense level to 47, which was reduced to the Guidelines maximum of 43. The PSR found that Delva's criminal history category was IV. The advisory-Guidelines-recommended range of imprisonment was thus life imprisonment for the conspiracies to commit kidnapping, robbery, and narcotics distribution, and for being a felon in possession of a firearm, plus a mandatory consecutive five-year term for possession of a firearm in furtherance of the narcotics conspiracy.

The district court found that Delva's criminal history category should be III instead of IV but otherwise adopted the factual findings in the PSR. The court found by a preponderance of the evidence that Delva was present at various times at the scene of the kidnapping/robbery and assisted in those crimes. It concluded that Delva's advisory-Guidelines-recommended range of imprisonment, despite the lower criminal history category, remained life imprisonment plus five years.

Cole and Jean Philippe, for their roles in the kidnapping/robbery, had been sentenced to prison terms of life plus seven years. The court found that Delva's conduct was somewhat less heinous, and it sentenced Delva to a below-Guidelines prison term of 360 months.

On appeal, Delva challenges his sentence as unduly harsh, arguing principally that the court impermissibly sentenced him largely for conduct of which he was acquitted, *i.e.*, the substantive offenses of kidnapping, robbery, and brandishing a firearm in furtherance of the kidnapping/robbery. He argues that MV was unable to identify him as one of the perpetrators of the kidnapping/robbery, that he presented evidence that he was elsewhere during the period in which those crimes were committed, and that the court's finding as to his presence in FV's apartment at various times during

36

the kidnapping/robbery is erroneous in light of his acquittals by the jury on those substantive counts. We are unpersuaded.

A district court commits a procedural error if it bases its sentence on a clearly erroneous finding of fact. *See*, *e.g.*, *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc), *cert. denied*, 556 U.S. 1268 (2009). It commits substantive error if its "decision cannot be located within the range of permissible decisions." *Id*. at 189 (internal quotation marks omitted).

Because the quantum of proof required for a verdict of guilt is higher than the quantum required for sentencing, it is established that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997); *see also United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005), *cert. denied*, 547 U.S. 1060 (2006); *United States v. Miller*, 116 F.3d 641, 685 (2d Cir. 1997) (not error for the sentencing court to rely on evidence at trial that the jury considered insufficient to establish a factual proposition beyond a reasonable doubt, where the court itself finds that proposition established by a preponderance), *cert. denied*, 524 U.S. 905 (1998). Although Delva asks us not to follow *Watts*, we are bound by that decision.

Nor are we entitled, as Delva urges, to overturn the district court's finding that he was, at various points, present at the kidnapping/robbery. Although Delva argues that "a far more reasonable view of the evidence" would be "that Delva was not present" (Delva brief on appeal at 69), it is beyond cavil that credibility assessments by the judge who presided over the trial are entitled to considerable deference, *see*, *e.g.*, *Gall v. United States*, 552 U.S. 38, 51-52 (2007); *United States v. Norman*, 776 F.3d 67, 76-77 (2d Cir.), *cert. denied*, 135 S. Ct. 2333 (2015), and that "[w]here there

37

are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). Plainly, there was evidence to support the district court's finding that Delva was present at the kidnapping/robbery; Delva acknowledges that the court relied on trial testimony by "Accilien [and] the government's DNA evidence" (Delva brief on appeal at 69). We cannot conclude that the district court's findings are clearly erroneous or that its ultimate decision was beyond the range of permissible decisions.

CONCLUSION

We have considered all of Delva's arguments on this appeal and have found in them no basis for reversal. The judgment is affirmed.

38

**DENNIS JACOBS, <u>Circuit Judge</u>, dissenting:**

I agree with the majority's analysis on all issues other than the Fourth

Amendment holding, which is of course the heart of the matter. As to the

holding that exigent circumstances allowed the survey of a bedroom in which the

police spotted things in plain view, I would remand for the district court to

consider it in the first instance. The government, which bears the burden of

proof, did not assert exigent circumstances in the district court, or here; and

Delva's counsel has not had a chance to say a word about it. Because I would

remand rather than affirm, I respectfully dissent.

The Fourth Amendment prohibits warrantless searches unless an exception

applies. The exception for items in plain view is subject to a proviso: "law

enforcement officers may seize evidence in plain view, provided that they have

not violated the Fourth Amendment in arriving at the spot from which the

observation of the evidence is made." <u>Kentucky v. King</u>, 563 U.S. 452, 462–63

(2011). The cellphone and the letters that Delva sought to suppress came into

plain view when the police reentered a bedroom that had already been subject to

a protective sweep. The question (not an easy one) is whether the officers

violated the Fourth Amendment in arriving at the spot (the bedroom) from which they saw evidence in plain view.

The district court held that the officers were lawfully in the bedroom as part of a protective sweep. The majority opinion demonstrates why the protective sweep exception is inapplicable, and there is no reason for me to recapitulate it.

The majority opinion nevertheless affirms on the ground of a different Fourth Amendment exception: exigent circumstances. In a nutshell, the majority opinion treats as exigency the need to find a private space to interview a suspect in a small and crowded apartment with no front door. The evidence was spotted when the police took Accilien into the only separate bedroom in the place.

The exigent circumstances exception is a limited one. Welsh v. Wisconsin, 466 U.S. 740, 749 (1984). The Supreme Court has recognized exigent circumstances where, for instance, police "need to provide urgent aid," or where they are "in hot pursuit of a fleeing suspect," or where they "fear the imminent destruction of evidence." Birchfield v. North Dakota, 136 S. Ct. 2160, 2173 (2016). And importantly, "'the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.'"

2

Harris v. O'Hare, 770 F.3d 224, 234 (2d Cir. 2014), as amended (Nov. 24, 2014) (quoting Welsh, 466 U.S. at 749-50).

The government did not argue exigent circumstances in the district court; the district court did not rule on exigent circumstances; and the government did not argue exigent circumstances on this appeal. It follows that Delva's counsel has not had an opportunity to argue the point, which has become crucial. It is not as though there would have been nothing for Delva's counsel to say: no published circuit opinion has found exigent circumstances in a case analogous to this one; and even if the bedroom was the only space for a private interrogation inside the apartment, an alternative venue may have been the street or a patrol car.

The government has a "heavy burden" to establish exigent circumstances, Harris, 770 F.3d at 234; the question is "heavily fact dependent," United States v. Andino, 768 F.3d 94, 98 (2d Cir. 2014); and we lack the benefit of a ruling by the district court or of briefing by the parties.

Rather than affirm, I would remand this case to the district court for briefing and for a finding as to whether the exigent circumstances exception (or some other Fourth Amendment exception) applies.